684 F.2d 1020
 221 U.S.App.D.C. 498
 KENOSHA AUTO TRANSPORT CORPORATION and Boat Transit, Inc., Petitioners,
v.
UNITED STATES of America and the Interstate Commerce
Commission, Respondents,
Recreational Products Transport, Inc. of Mendon, Ma., Intervenor.
 No. 81-1368.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 11, 1982.
Decided Aug. 6, 1982.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Paul F. Sullivan, Washington, D. C., with whom John T. Wirth, Denver, Colo., was on the brief, for petitioners.
 Edward J. O'Meara, Atty., I. C. C., Washington, D. C., with whom Richard A. Allen, Gen. Counsel, Kathleen M. Dollar, Associate Gen. Counsel, Linda J. Joachim, Atty., I. C. C., Robert B. Nicholson and Susan J. Atkinson, Attys., Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 Mel P. Booker, Jr., Alexandria, Va., was on the brief, for intervenor.
 Before MacKINNON, Circuit Judge, McGOWAN, Senior Circuit Judge, and NORTHROP,* Senior District Judge for the District of Maryland.
 Opinion for the Court filed by Circuit Judge MacKINNON.
 MacKINNON, Circuit Judge:
 
 
 1
 Two motor carriers specializing in the nationwide transportation of boats and related equipment here petition for review of the certification by the Interstate Commerce Commission (ICC and Commission) of a new common carrier entrant into that narrowly specialized field of transportation. Under the liberalized entry policies recognized by the Commission in 1979 (which were adopted by the Motor Carrier Act of 1980) we conclude that substantial evidence supports its decision and therefore affirm.
 
 I. Background
 
 2
 A. Recreational's Application for Common Carrier Authority
 
 
 3
 Jesse F. White, Inc. (White), is a substantial boat distributor located in Mendon, Massachusetts that has been in business since 1940.[1] In recent years White has purchased boats from manufacturers (App. 96.) located in Florida, Wisconsin, Nebraska, California, the far West, the Southeast and other parts of the country. (App. 77-79, 89, 92, 96, 105, 111-112; Exh. # 1 at App. 199.) These purchases result in a few shipments that move directly from the place of manufacture to customer/dealer locations but most move to White's facility at Mendon. (App. 95.) Many of these boats and related equipment were transported by White's own trucks and trailers. Such transportation is generally described as "private carriage."[2] White owned "six tractors and nine trailers" that it employed in its private carriage. (App. 62.)
 
 
 4
 In 1979 White decided to seek motor common carrier operating authority to haul boats because it found the costs of private carriage to be prohibitive.[3] (App. 47-49.) The decision was prompted by increased fuel costs and the additional inefficiency caused by deadheading motor equipment where return loads could not be obtained. White in its relations with existing common carriers had also experienced difficulty with delayed deliveries and damage to boats. (App. 85, 87.)
 
 
 5
 White therefore incorporated Recreational Product Transportation, Inc. (Recreational), leased its tractors and trailers to Recreational (App. 69.), and used the same experienced personnel. (App. 53-56.) In 1979 Recreational obtained emergency temporary authority from the ICC to transport boats and related equipment for a period of four months.[4] During that period which ended in June 1979, Recreational operated with four tractors and four trailers. (App. 76.) In the four month period of operations Recreational handled 29 shipments[5] between various locations.[6] Twelve of the shipments originated in Mendon, Massachusetts and were received in the other New England states[7] or in New York. Nine shipments were destined for Mendon, six having originated in Florida and the remaining three in Arkansas, South Carolina, and Wisconsin. Eight shipments involved points outside Massachusetts but included the New England states, Florida, Maryland, New York or Virginia. (Exh. # 1, App. 199.) In so operating Recreational found that there was an increasing demand for common carrier services (App. 59-61.), including a limited demand from boat owners for secondary movements.[8] After the emergency temporary authority expired, and further temporary authority was denied, it had to refuse requests for private carriage from other companies because of the escalating costs of operating one way empty. (App. 88.) One of these companies was located in Nebraska and one in Wisconsin. (App. 77-78.) At the time of the hearing Recreational had available three licensed tractors, four trailers (App. 80.) and two experienced drivers. (App. 81.)
 
 
 6
 Accordingly, Recreational filed an application with the Commission for common carrier authority to transport boats and related equipment both locally and nationwide. The boating industry has four main centers: California, New England, the Great Lakes and Florida. (App. 143.) There are boat manufacturers in every state. (App. 185.) Essentially, the application by Recreational proposed to "carve out the private carrier operation of Jesse White and set it up as for hire on the side." (App. 98.)
 
 
 7
 B. The Protests to Recreational's Application
 
 
 8
 The record indicates that about 15 major common carriers compete nationwide in the boat hauling business. (App. 149, 170.) Only two of these companies opposed Recreational's application.
 
 
 9
 Boat Transit, Inc. was one of the protestors. At the time of its protest it operated 86 tractors and 176 trailers (App. 131.), and in 1978 had total annual revenues of $7,538,477. (App. 273.) Boat Transit has an excess of business for its company-owned equipment and to a certain extent employs outside owner-operators to transport boats and related equipment. (App. 139-140.) Its average shipments travelled 1,600 miles. (App. 147.) Its trucks operated 85% loaded in 1980 (App. 135.) and from the New England area its outbound traffic exceeded its inbound traffic by a ratio of two to one. (App. 134.)
 
 
 10
 Kenosha Auto Transport Corporation (Kenosha) was the other objector to Recreational's application. In 1980 Kenosha had 76 tractors and 258 boat hauling trailers. (App. 157.) It operated 82% loaded and most of its traffic from New England was outbound. (App. 166.) In 1979 its total revenues from all transport services were $46,091,580 (App. 178, 273.), of which it estimated that a maximum of three percent could be subject to diversion if Recreational's application were granted. (App. 178-179.) Kenosha's outbound traffic from New England was also in a ratio of two to one to its inbound traffic. (App. 180.)
 
 C. The Hearing on the Application
 
 11
 Recreational's application was filed with the Commission on April 17, 1979. It came on for hearing before Administrative Law Judge Glennon (ALJ) on July 8, 1980, at which time the foregoing facts were adduced. The ALJ on October 10, 1980 granted Recreational's application.[9] The grant was divided into two parts which are referred to hereinafter as parts (a) and (b):
 
 
 12
 (a) To operate as common carrier, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting boats, and boat parts, supplies, and equipment moving in connection therewith, between Mendon, MA on the one hand and, on the other, points in the states of CT, MA, ME, NH, NY, RI and VT; and (b) between points in the states of CT, MA, ME, NH, RI, and VT on the one hand and, on the other, points in the United States except points in the states of AK, CT, DL, HI, MA, ME, NH, NJ, NY, RI and VT.
 
 
 13
 (App. 237.) This division is important because the protestants have stated that this petition for review is "essentially concerned with the grant of authority in part (b)." Initial Brief of Petitioners at 3.
 
 
 14
 Exceptions to the decision of the ALJ were filed by the two protestants (App. 238-248, 257-270.) and Recreational replied thereto. (App. 271-283.) On appeal to the ICC, Division I denied the appeal, ruling that the protestants' primary evidence was that they were transporting traffic subject to diversion and that such a showing did not establish an interest entitled to regulatory protection.[10] The protestants' petition for administrative review was subsequently denied by the full Commission by order. (App. 286.)
 
 II. Applicable Law
 
 15
 An important preliminary determination is that of which law governs in this case. Recreational's application was filed on April 17, 1979, at a time when the old law, 49 U.S.C. § 10922 (Supp. III 1979),[11] was in effect. The Motor Carrier Act of 1980, Pub.L.No.96-296, 94 Stat. 793 (1980) became effective on July 1, 1980.[12] The hearing by the ALJ began on July 8, 1980 and his decision (App. 231-37.) was rendered on October 10, 1980.
 
 
 16
 That sequence of events raises the issue of whether the old law, or the Motor Carrier Act of 1980, was to be applied by the ALJ and the Commission in ruling on Recreational's application and petitions for administrative review. In Art Pape Transfer, Inc., Extension-Commodities in End-Dump Vehicles, 132 M.C.C. 84, 92-95 (1980), the Commission set forth procedures to be followed in processing applications that were pending at the time the Motor Carrier Act of 1980 was enacted. In such situations, where the parties submitted evidence under the statutory standards prevailing before the enactment of the new law, the Commission determined that it would first examine the application and evidence under the standards of the old law. The Commission assumed that in almost all cases if the application were satisfactory under the old law, it would also pass muster under the requirements of the new law. In the event the application would be denied, in whole or part, under the old law, the Commission would then examine it under the standards of the new law-allowing "the parties an opportunity to address the implications of the new law through the submission of evidence or argument." Id. at 95.
 
 
 17
 The ALJ properly proceeded in accordance with the procedures prescribed by the Commission which we approve as being reasonable and within the discretion of the Commission to establish. The ALJ first applied the old law and reviewed the record in light of what had "become the Commission's interpretation of the 'old' law and regulations." (App. 236.) He concluded that because "the application must be granted under standards employed by the Commission pursuant to the old law, no discussion of the impact of the new law (was) required." (App. 237.)
 
 
 18
 The question might be raised of which law this court should apply upon review. Courts of appeal generally apply the law in force at the time of their decisions. Fusari v. Steinberg, 419 U.S. 379, 387, 95 S.Ct. 533, 538, 42 L.Ed.2d 521 (1975); Diffenderfer v. Central Baptist Church, 404 U.S. 412, 414, 92 S.Ct. 574, 575, 30 L.Ed.2d 567 (1972); Hall v. Beals, 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214 (1969); Thorpe v. Housing Authority, 393 U.S. 268, 281-82, 89 S.Ct. 518, 525-526, 21 L.Ed.2d 474 (1969); United States v. Alabama, 362 U.S. 602, 604, 80 S.Ct. 924, 926, 4 L.Ed.2d 982 (1960). In many instances this might produce a different result, but not so here because the Commission in 1979 was already interpreting the old law in a manner that essentially comported with and certainly foreshadowed the standards adopted in the Motor Carrier Act of 1980. The statutory entry standards contained in the new law were less rigorous than even the liberalized entry standards the Commission had been applying under the old law.
 
 
 19
 A. Previous Law and the History of the Trucking Industry
 
 
 20
 In Art Pape Transfer, supra, at 93, the Commission summarized what applicants for common carrier authority had been required for many years to establish:
 
 
 21
 Under the old law every common carrier seeking to enter the regulated trucking industry or expand its existing operations had to meet two substantive statutory tests. First, it had to demonstrate that it was "fit, willing and able" to provide the proposed transportation service. Second, it had to show that the transportation to be provided "is or will be required by the present or future public convenience and necessity." See old 49 U.S.C. 10922(a).
 
 
 22
 In applying the second substantive test the Commission interpreted "public convenience and necessity" in accordance with its 1936 decision in Pan-American Bus Lines Operations, 1 M.C.C. 190, 203 (1936):
 
 
 23
 The question, in substance, is whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.
 
 
 24
 It is this second test that has been substantially altered. A report of the House Committee on Public Works and Transportation observed that
 
 
 25
 the Commission (had) reevaluated its historic approach toward applications for authority to operate as motor common carriers. For example, in Ex Parte No. MC-121, Policy Statement on Motor Carrier Regulation, 44 Fed.Reg. 60296 (1979), the Commission determined that the "adequacy" of existing service should no longer be a factor in considering applications. The purpose in making that change was to place more emphasis on the benefits of competition rather than on the protection of existing carriers.
 
 
 26
 H.R.Rep.No.1069, 96th Cong., 2d Sess. 13 (1980) (hereinafter House Report ).
 
 
 27
 The change in policy from the 1930's to the 1980's as represented by the shift from the 1936 standards set forth in Pan-American, supra, to the 1979 Policy Statement in Ex Parte No. MC-121, supra, was brought about because the trucking industry had changed from a struggling industry in 1935 when the first Motor Carrier Act was enacted to one of the largest industries in America by 1979. Today the trucking industry is the nation's largest employer with over nine million employees. It carried 510 billion ton miles of freight in 1976 and its operating revenues for 1977 exceeded $23.2 billion. The largest trucking companies had an average return on equity of 18.5 percent for 1978. 44 Fed.Reg. 60298 (Oct. 19, 1979).
 
 
 28
 For some time it has been recognized that today's thriving trucking industry no longer requires the protection from competition that was warranted in earlier years. In fact, the courts in P. C. White Truck Line, Inc. v. ICC, 551 F.2d 1326 (D.C.Cir.1977), and in Trans-American Van Service, Inc. v. United States, 421 F.Supp. 308 (N.D.Tex.1976), stated that "the Commission was required to consider '... the contribution that increased competition might make to the public weal.' P. C. White, supra, 551 F.2d at 1329." 44 Fed.Reg. 60297 (Oct. 19, 1979). All this brought about Ex Parte No. MC-121, 44 Fed.Reg. 60296-60300 (Oct. 19, 1979); and the Motor Carrier Act of 1980, Pub.L.No.96-296, 94 Stat. 793 (1980); with its new "Motor Carrier Entry Policy," 94 Stat. 794-796, see 49 U.S.C.A. § 10922 (1982 Supp.); its change in the National Transportation Policy concerning motor carriers, 94 Stat. 794, see 49 U.S.C.A. § 10101(a) (1982 Supp.); and its removal of certain restrictions, 94 Stat. 796-797. See generally House Report, supra at 12-17.
 
 
 29
 The Senate Committee Report on the new law also indicated that the prior motor carrier entry policies were being drastically altered:
 
 
 30
 The Committee clearly rejects the historic approach of the ICC toward applications for authority to operate as motor common carriers of property. S. 2245 adopts a new section to govern such applications which reflects the Committee's strong belief that competition will bring about the most efficient and economical delivery of transportation service to the public.
 
 
 31
 S.Rep.No.641, 96th Cong., 2d Sess. 5 (1980) (hereinafter Senate Report ). It thus seems clear that the Policy Statement in Ex Parte No. MC-121 was endorsed by Congress when it passed the 1980 Act.[13]
 
 B. The House Committee Report
 
 32
 Inasmuch as the Senate on final passage of the Motor Carrier Act of 1980 adopted the House amendments without any change, 126 Cong.Rec., S. 7684-7685 (daily ed. June 20, 1980), we point to several statements in the House Report as an authoritative indication of the congressional intent with respect to the change in the "entry policy" for those proposing to enter the motor transportation field. On this point the House Report states:
 
 
 33
 The Committee believes that it is incumbent on the Congress to provide the Commission with guidance regarding motor carrier entry policy. A liberalized entry policy will have a significant impact on the motor carrier industry.
 
 
 34
 The great weight of the testimony, however, was that entry into the motor carrier industry should be liberalized along the lines of the Commission's current policy as set forth in Ex Parte No. MC-121.
 
 
 35
 Paragraph (1) of the new section 10922(b) sets forth the entry standards to be used by the Commission in determining whether to issue a certificate authorizing operation as a motor common carrier of property. It retains the traditional test that all applicants must be fit, willing, and able. However, it revises the public convenience and necessity requirement. Specifically, it reduces the burden of proof on persons supporting the application. Persons supporting the application will be required to come forward with some evidence of a public need or demand for the service.
 
 
 36
 House Report, supra at 13-14 (emphasis added).
 
 
 37
 The House Report further articulated the congressional intent as to the standards to be applied in proving "public demand or need":
 
 
 38
 (T)he Committee does not intend to restrict the Commission in which factors it can consider in determining whether the proposed service is responsive to a public demand or need. These factors include the following: a need or demand for new services, innovative quality or price options, increased competition, greater fuel efficiency, improved service for small communities, improved opportunities for minorities, and any other benefits that would serve a useful public purpose. This is consistent with the Commission's consideration of the National Transportation Policy, including any of the applicable factors listed in section 10101(a)(7)(A) through (H).
 
 
 39
 House Report, supra at 15 (emphasis added). In this case both protestants have admitted that granting the application would not be detrimental to the National Transportation Policy (App. 137, 186-187).[14]
 
 
 40
 The legislative history also indicates a complete shift in the burden of proof once a useful public purpose is established:
 
 
 41
 Under new section 10922(b)(1), once the applicant has made a prima facie showing that the proposed service would serve a useful public purpose, the burden of proof would shift to persons opposing issuance of the certificate to show that the proposed service is inconsistent with the public convenience and necessity. In other words, it creates a presumption that the grant of the application is consistent with the public convenience and necessity if the applicant demonstrates that the proposed service will serve a useful public purpose.
 
 
 42
 House Report, supra at 15.
 
 
 43
 Thus, proof of some possible diversion, without more, is insufficient to support a denial of a new entry if the applicant meets the other minimal requirements.
 
 
 44
 C. Senate Legislative History on Final Passage
 
 
 45
 Further significant legislative history indicative of the congressional intent of the bill in its final form occurred on final passage in the Senate where the Act originated. Much of this appears as a colloquy between Senator Cannon, the Chairman of the Committee on Commerce, Science and Transportation that handled the bill and Senator Packwood, the ranking minority member of that committee. This colloquy, and the earlier Senate Report, indicate that the two houses were in substantial agreement on all the material provisions that are relevant to this case and that the intent of both bodies coincided in recognizing the liberalized entry policy for new motor carriers over that employed in the earlier years of the Motor Carrier Act of 1935. Referring to the new entry policy, Senator Packwood explained:
 
 
 46
 The House Report says that shipper support would still be effective evidence, but that there should be no restriction on how carriers should prove their cases. I would agree.
 
 
 47
 126 Cong.Rec. S. 7685 (daily ed. June 20, 1980).
 
 Senator Cannon indicated agreement:
 
 48
 MR. CANNON. Indeed, that is right. In the legislation we admonish the ICC to follow the direction of the new law faithfully-and we mean it.... (T)he Senate Commerce Committee will carefully monitor the Commission to be sure that our new liberalized entry policy is implemented promptly and effectively. We expect the end of long delays, the end of narrowly granted authority, the end of expensive litigation, the end of virtually all oral hearings, the end of frivolous protests, and the beginning of a new era in which those who feel that they have a service to offer to the public have an opportunity to do so. The fact that another carrier is performing the service is no longer an obstacle to acquiring new authority.
 
 
 49
 Id.
 
 
 50
 Senator Packwood recited the factors in the House Report, above referred to, which would support a conclusion that the applicant serve a useful public purpose:
 
 
 51
 These factors, include the following: A need or demand for new services, innovative quality or price options, increased competition, greater fuel efficiency, improved service for small communities, improved opportunities for minorities, and any other benefits that would serve a useful public purpose.
 
 
 52
 Any one or more of these factors will be sufficient to create a presumption that an application should be approved.
 
 
 53
 Id. (emphasis added). That is strong language-"any one ... of (the stated) factors" would suffice.
 
 Senator Cannon continued:
 
 54
 In addition, I would think the Commission should read the new entry standards in conjunction with the restriction removal section. In other words, the grants of authority under the new law should not continue to be the extremely narrow geographic and commodity grants that are noted throughout the hearing record. Under the restriction removal section, existing carriers have the opportunity to rationalize their operating authority and be able to serve wider areas and carry more commodities. Certainly we would expect no less for new applicants.
 
 
 55
 Mr. PACKWOOD. I would certainly agree with that. I would be terribly disappointed to see a continuation of the restrictive type of certificates that so many carriers have now....
 
 
 56
 Id.
 
 
 57
 III. Substantial Evidence Supports the Grant of Nationwide
 
 Authority to Recreational
 
 58
 The principal argument of the protestants is that Recreational failed to proffer substantial evidence to establish a showing of public demand or need that would support a certificate granting nationwide authority.[15] The protestants allege that Recreational's sole evidence of public demand or need came from its affiliated company, Jesse F. White, Inc. Initial Brief of Petitioners at 9. The protestants concede that the supporting testimony of White is "sufficient to sustain the findings of the ALJ (adopted by the Commission) in part (a) of the grant ... (but) vigorously disagree that there is sufficient evidence of record to sustain the grant of part (b), except with respect to the point of Mendon, MA." Id. at 12. In short, the protestants contend that Recreational failed to present "a prima facie showing for a complete grant of its application. It made a prima facie showing for Mendon, MA, and that is all." Id. at 17. We disagree.
 
 
 59
 As readily acknowledged by the ALJ, Recreational did "not put into evidence a strongly supported or documented factual presentation." (App. 236.) However, the fact that the application was not strongly supported does not mean that it was without sufficient support. The ALJ expressly found that the application complied with the "old" law and in so doing articulated the evidentiary support he discerned in the record for meeting the "need" and "competition" standards:
 
 
 60
 (t)here is a showing that the Jesse White distributorship is likely to use applicant in a continuing pattern of operations, provided applicant can secure backhaul traffic. Judging from applicant's experience during its emergency temporary authority operations and from Jesse White's own experience, there should be no problem in securing backhaul traffic for applicant. Jesse White does not need additional common carrier service, in the sense of lacking access to reasonably timely and responsive for-hire service from already authorized carriers. But it does have a need for transportation service which, if all goes well, the applicant corporation could either take over entirely or assist in handling. This new availability of applicant will constitute a new boat transportation service competitive in some respects, if not significantly comparable, with that service offered to Jesse White, and at least a limited number of shippers, by the protesting carriers. While applicant is not likely in the foreseeable future to make any significant financial investment in terminals or administrative support systems, as have the protesting carriers, nor, otherwise, to establish the kinds of nationwide advertising or servicing networks that the protesting carriers have, its service will be competitively available to the public from time to time, especially in providing fronthauls or backhauls for the Jesse White distributorship.
 
 
 61
 (App. 236.) (emphasis added). Speaking directly to the point of whether Recreational's primary reliance on White for business was a sufficient basis for granting nationwide authority, the ALJ reasoned:
 
 
 62
 By itself, the Jesse White record of past transportation movements would seem to indicate a justification for a service territory primarily along the east coast. But there are periodic shipments beyond this eastern territory and, on a prima facie basis at least, there seems no good reason to limit applicant's, and Jesse White's, potential flexibility in expanding their pertinent marketing operations.
 
 
 63
 Id. (emphasis added). The "periodic shipments" beyond the eastern territory which the ALJ referred to were detailed earlier in his opinion and included shipments to or from states outside New England such as Florida, Maryland, New York, South Carolina, Virginia and Wisconsin. (App. 231.) We believe that the Commission's grant of nationwide authority appears to be fully supportable based on the national character of the boat industry,[16] the demonstrated extent of White's previous and potential business,[17] and the established need for front haul and back haul loads in order to insure a viable operation.
 
 
 64
 Such certification is also consistent with the Commission's opinion in Art Pape Transfer, supra at 96:
 
 
 65
 The Commission has always sought to act under the general policy of issuing grants of authority with broad commodity and territorial descriptions to enable a carrier to render shippers and the public a complete transportation service. FoxSmythe Transp. Co. Extension-Oklahoma, 106 M.C.C. 1, 28, 29 (1967); Warren Transport, Inc., Ext.-Agric. Implements, 124 M.C.C. 641, 647-648 (1976). Broad grants of authority also take cognizance of technological modifications, changing industrial patterns, and future needs, and allow carriers to meet changing needs of shippers and receivers, market demands, and the diverse requirements of the shipping public....
 
 
 66
 Similarly, when an applicant for a certificate seeks new authority to provide transportation to many localities in a large geographical area, we have not traditionally required that it demonstrate a specific need for service to each point. There is no requirement that data on public need and benefit be gathered for every village and hamlet in the area of proposed operations before a certificate of such encompassing scope be awarded. May Trucking Co. v. United States, 593 F.2d 1349, 1353 (D.C.Cir.1979). See also Miller Transporters, Inc. v. United States, 594 F.2d 463, 466-467 (5th Cir. 1979). All that is required is that applicant submit evidence which is sufficiently representative of the transportation needs of the shipping public in the relevant market to enable us to make an informed determination of the public interest in a given case.
 
 
 67
 Accordingly, we affirm the conclusion of the ALJ and the Commission that Recreational established a prima facie justification for a grant of nationwide common carrier authority.
 
 
 68
 The Commission's grant of nationwide authority was also grounded on the ALJ's determination that the protestants "failed to demonstrate a justification for any regulatory protection from any competition likely to emanate from the applicant's operations." (App. 236.) It is on this point of the impact of competition on existing service-which is closely tied to eased entry-that the Commission's position had most significantly changed in interpreting the old law-even before Ex Parte No. MC-121 was formally adopted. The Commission and the courts were interpreting the Interstate Commerce Act to encourage new competition in the trucking industry before Recreational filed its application for common carrier authority. This court in May Trucking Co. v. United States, 593 F.2d 1349, 1356 (D.C.Cir.1979), stated that "(i)njury to existing carriers through competition becomes relevant only when there is corresponding injury to the public. Congress designed the Interstate Commerce Act to benefit the people, not to create protected monopolies for those who profess to serve the public." We further observed in May that the loss of customers which is frequently associated with competition ordinarily serves to promote rather than injure the public interest. Id. Relying upon our statements in May, the ALJ here specifically found that the protestants had not shown "that diversion of traffic or revenues from protestants operations would amount to injury to the public." (App. 236.) We have found no evidence in the record that would cause us to dispute that finding.
 
 
 69
 The ALJ also correctly held that the family relationship between the persons controlling Recreational and White does not constitute a basis for denying or restricting the application. See Atlantic Coast Exp. Inc., Ext.,-East Coast Ports, 132 M.C.C. 184 (1980).
 
 
 70
 We hold that substantial evidence supports the conclusion of the ALJ and the Commission that Recreational met its burden and that the proof offered by protestants is deficient under the liberalized policies applied by the Commission in recent years that presently favor increased competition and reduced entry requirements. It's a new ball game. The Commission's decision is therefore affirmed.
 
 
 71
 Judgment accordingly.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(d)
 
 
 [1]
 White was incorporated in 1960. (App. 47.)
 
 
 [2]
 Private carriage: When a manufacturer or a distributor uses its own equipment to transport freight to and from its facility
 
 
 [3]
 It is conceded that private carriers cannot operate as efficiently as common carriers (App. 186.), and that their costs are prohibitive. (App. 102.)
 
 
 [4]
 White had dealers-250 to 300 accounts. (App. 69.)
 
 
 [5]
 In testimony before the ALJ on July 8, 1980, Emerson White, the president and chief operating officer of Recreational Transport, Inc.-who is also the president of Jesse F. White, Inc., stated that Recreational handled 21 or 22 shipments while it had emergency temporary authority. (App. 49.) Recreational's "Trip Report While Operating Under Emergency Temporary Authority" (MC 154817 R), which was accepted at the ALJ hearing as "Exhibit # 1," shows that between February 5, 1979 and June 7, 1979, Recreational actually transported 29 shipments. All of the shipments involved boats except for two which involved trailers. (App. 199.)
 
 
 [6]
 See generally Exh. # 1 (App. 199.) and the decision of the administrative law judge. (App. 231.)
 
 
 [7]
 The six New England states consist of Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, and Vermont
 
 
 [8]
 "Secondary movement" is transportation of a private individual's boat. (App. 73.) Recreational made only one secondary movement during the emergency temporary authority period. Id
 
 
 [9]
 The service date of the ALJ's decision was November 3, 1980. (App. 231.) The grant of operating authority was made subject to the subsequent issuance of an appropriate document. (App. 237.)
 
 
 [10]
 The Division ruled in part:
 (I)t appears that a grant to transport boats and related equipment is consistent with the evidence of record. Protestants essentially only adduce evidence that they are now transporting traffic which is subject to diversion. This showing is insufficient to establish an interest which is entitled to regulatory protection.
 It is ordered:
 The appeals are denied because the findings of the Administrative Law Judge are in accordance with the evidence and the applicable law.
 (App. 284.)
 
 
 [11]
 49 U.S.C. § 307 (1976) was revised and recodified as part of the Act of October 17, 1978, Pub.L.No.95-473, § 10922, 92 Stat. 1409 (1978). The recodified provision stated:
 (a) Except as provided in this section and section 10930(a) of this title, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II or III of chapter 105 of this title as a motor common carrier or water common carrier, respectively, if the Commission finds that-
 (1) the person is fit, willing, and able-
 (A) to provide the transportation to be authorized by the certificate; and
 (B) to comply with this subtitle and regulations of the Commission; and
 (2) the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity.
 49 U.S.C. § 10922(a) (Supp. III 1979).
 
 
 [12]
 Section 5 of the Motor Carrier Act of 1980 amended 49 U.S.C. § 10922 (Supp. III 1979). The new provision concerning the certification of motor common carriers of property states:
 (b)(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds-
 (A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and
 (B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need ;
 unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.
 (2) In making a finding under paragraph (1) of this subsection, the Commission shall consider and, to the extent applicable, make findings on at least the following:
 (A) the transportation policy of section 10101(a) of this title; and
 (B) the effect of issuance of the certificate on existing carriers, except that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.
 49 U.S.C.A. § 10922(b)(1)-(2) (1982 Supp.) (emphasis added).
 
 
 [13]
 We agree with the Commission's reading of the new law which concludes that "Congress has endorsed (its) recent initiatives in the area of motor carrier entry (including the standards (it) established in under (sic) Ex Parte No. 121, Policy Statement on Motor Carrier Regulation, 44 F.R. 60296 (Oct. 1(9), 1979))." Art Pape Transfer, supra at 93
 
 
 [14]
 The National Transportation Policy with respect to motor carriers provides:
 (a) Except where policy has an impact on rail carriers, in which case the principles of section 10101a of this title shall govern, to ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes-...
 (7) with respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers, and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions; (E) provide and maintain service to small communities and small shippers; (F) improve and maintain a sound, safe, and competitive privately-owned motor carrier system; (G) promote greater participation by minorities in the motor carrier system; and (H) promote intermodal transportation.
 49 U.S.C.A. § 10101(a)(7) (1982 Supp.).
 
 
 [15]
 The opinion of the ALJ discussed in some detail Recreational's operating experience and performance under its emergency temporary authority. He also discussed the company's management, capital structure, equipment and driver experience. (App. 231-233.) On the basis of evidence presented on those matters, the ALJ found that Recreational "is fit, willing and able properly to perform the transportation authorized and to comply with the Act and the Commission's regulations." (App. 237.) We do not understand protestants to challenge either Recreational's showing or the ALJ's finding on this first substantive statutory requirement under both the old and the new laws
 
 
 [16]
 See text supra at 1021, 1022
 
 
 [17]
 The ALJ Noted that White's principal source of larger boats is a manufacturer located in Sarasota, Florida and that its supplier of an unspecified volume of smaller boats is a manufacturer located in Wisconsin. (App. 232.) Testimony was also presented to the ALJ stating that manufacturers in Nebraska and Wisconsin inquired of White in 1979 whether it would be able to provide transportation to pick up the boats it was purchasing. (App. 77-78.) Although discussed in the context of the quality of service Boat Transit was rendering to White, testimony was heard by the ALJ which indicated that White purchased boats which were manufactured and made available for pick up in California, Texas (App. 111-112, 131.), the far West and Southeast. (App. 79.)