**C & H TRANSPORTATION CO., INC. and J.H. Rose Truck Line, Inc., Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

No. 81–4269.

United States Court of Appeals, Fifth Circuit.

May 13, 1983.

---

Thomas E. James, Dallas, Tex., James M. Doherty, Austin, Tex., for petitioners.

Colleen J. Bombardier, Craig M. Keats, Gen. Counsel, I.C.C., Robert B. Nicholson, Margaret G. Halpern, Attys., Dept. of Justice, Antitrust Div., Washington, D.C., for respondents.

Arthur J. Cerra, Kansas City, Mo., for intervenor Ricky Shaw & Sons Transp. Co., Inc.

Before THORNBERRY, REAVLEY and GARWOOD, Circuit Judges.

GARWOOD, Circuit Judge:

This is a petition for review of an order of the Interstate Commerce Commission ("ICC") granting the intervenor's application for a motor common carrier certificate of convenience and necessity to transport metal products, nonelectrical machinery, and transportation equipment between points in the United States. The principal questions are whether the intervenor was required to prove, as part of its fitness to perform the proposed service, the operational feasibility, from a quantitative standpoint, of its conducting a nationwide service, and whether there is a rational relationship between the geographical scope of the public need shown for the proposed service and the geographical breadth of the authority granted intervenor by the ICC to satisfy that need. We hold that the intervenor was not required to so demonstrate the operational feasibility of its proposal, and that the ICC's order is rational and supported by substantial evidence. We therefore affirm its grant of nationwide authority to the intervenor.

## THE FACTS

Intervenor Ricky Shaw Transportation Company, Inc. ("Ricky Shaw"), is a motor common carrier operating in the commercial zone of Kansas City, Missouri and Kansas, and in Missouri intrastate commerce under the authority of the Missouri Public Service Commission. Ricky Shaw also has nationwide authority from the ICC to serve the United States Department of Defense by transporting contractors' machinery, equipment, materials and supplies, iron and steel articles, metal tanks, highway and off-highway motor vehicle equipment and component and replacement parts, and commodities, which, because of size and weight, require the use of special equipment. *See* 45 F.R. 43286; *Transportation of Government Property,* 131 M.C.C. 845, 860 (1979).

On September 24, 1980, Ricky Shaw filed an application with the ICC requesting a certificate of convenience and necessity to transport lumber or wood products, primary metal products, fabricated metal products, machinery and supplies, and transportation equipment over irregular routes between points in the United States. The application shows that Ricky Shaw owns a single terminal in Kansas City, seven power units, and fifteen trailers.[1] In its application,

---

1. An equipment list filed by Ricky Shaw shows that his fleet is composed of five tandem-axle diesel trucks, one crew cab, one pickup, one single-axle diesel truck, five drop-deck lowboy

Ricky Shaw also states that it is "financially able to lease or purchase additional equipment when and if it is needed." The application contains a balance sheet and an income statement which show that Ricky Shaw has assets of $251,861.77, and that during the first eight months of 1980, it had total operating revenues of $168,416.20, total expenses of $129,526.97, and a profit before taxes of $38,889.23.

In a verified statement, Julius Wright, General Manager of Ricky Shaw, testified that Ricky Shaw would operate seven days a week, twenty-four hours a day, and render an on-call and demand irregular route service; that it would move its shippers' equipment or products from the shippers' main facilities, or from any point where the products or equipment were purchased, to the customers who bought or leased them; and that when an equipment or product item was leased and the job completed or the lease terminated, it would transport the item to the next lease site.

Twelve shippers, all of whom are domiciled in the Kansas City commercial zone, supported Ricky Shaw's application by filing verified certificates of shipper support.[2]

trailers, three flatbed trailers, two stretch trailers, three van trailers, and two gooseneck flatbed trailers.

2. The supporting shippers are:

(a) G.W. VanKeppel Company of Kansas City, Kansas, a seller and lessor of construction and material handling equipment, which testified that it would tender Ricky Shaw two loads per month of "construction and contractor's equipment" to be transported "between points in Kansas City and Missouri."

(b) Contractors Supply Company of Kansas City, Missouri, a seller and lessor of construction equipment, contractor's equipment, and related supplies, which stated that it would tender Ricky Shaw one to two loads per month of "construction and contractor's equipment" to be transported primarily "between points in MO, NE, IA, KS, and AR," and secondarily, "between points in MO, on the one hand, and all 47 states on the other hand."

(c) Shaw Iron and Metal Corporation of Kansas City, Missouri, a buyer and seller of used plant equipment, machinery, usable iron and steel, structural steel, and other usable metal, which stated that it would tender Ricky Shaw two loads per month of "used iron and steel, used structural steel, used plant equipment and machinery, scrap iron and metal" to be transported "[f]rom points in the United States to Kansas City and from Kansas City to points in the United States."

(d) Lee Equipment Company of Overland Park, Kansas, a buyer and seller of used construction equipment and contractor's equipment, which stated that it would tender Ricky Shaw two machines per month of "construction equipment, contractor's equipment, and off-highway vehicles" to be transported "[b]etween all points in the United States."

(e) S & W Equipment/Tom Williams Company of Kansas City, Missouri, a wholesaler and retailer of used metal tanks, which stated that it would tender Ricky Shaw two loads per month of "metal tanks" to be transported "[b]etween points in the United States."

(f) Kenworth Truck Company of Kansas City, Missouri, a manufacturer of Kenworth Trucks, which stated that it would tender Ricky Shaw one load per week of "highway and off-highway trucks, component and replacement parts" to be transported "from our manufacturing plant in Kansas City to points in the U.S. and from points in the U.S. to Kansas City plant," and also to ship "trucks and component parts between points in the U.S."

(g) Midwest Steel Corporation of Kansas City, Missouri, a buyer and seller of structural steel, stated that it would tender Ricky Shaw one load per month of "structural steel" to be transported from Missouri to Kansas, Iowa, Nebraska, and Oklahoma.

(h) Shaw & Sons Equipment Rental, Inc. of Kansas City, Missouri, a buyer, seller, renter, and lessor of "construction equipment and contractor's supplies and equipment," which stated that it would tender Ricky Shaw two to three loads per week of "construction equipment, contractor's equipment, material handling equipment, demolition equipment, and highway and off-highway vehicles" to be transported between "[a]ll points between the 48 states of the Continental United States."

(i) Victor L. Phillips Company of Kansas City, Missouri, a seller and lessee of "new and used construction and contractor's equipment and supplies," which stated that it would tender Ricky Shaw one to four loads per month of "construction and contractor's equipment" to be transported "[b]etween points in Ks, MO, IA, NE, OK, AR, TX, and LA."

(j) Airmark Corporation of Kansas City, Missouri, a manufacturer of metal tanks, which stated that it would tender Ricky Shaw one tank per week to be transported from Kansas City to "points in KS, OK, NE, IA, IL, OH, PA, NY, MA, CT, NH, DE, NJ,

Seven of the shippers complained of an inability to obtain carrier commitments when needed. Three of the shippers also stated that they used private carriers to transport their equipment or products.

Six of the shippers, engaged in a nationwide business of buying, selling, or renting bulky equipment or products, stated that because some or all of their shipments were so costly to transport, their practice was to buy the items at the auction or sales site, which might be in almost any state, and then to transport them from that site directly to the ultimate buyer, who likewise might be located anywhere in the continental United States, or to lease an item to one customer and then transport it directly from that customer's location to another customer, without returning it to the shippers' plant sites in or near Kansas City. These shipments were not made between regularly recurring locations. Another shipper, engaged in the manufacture of iron pipe and cast-iron fittings, expressed a need for a carrier to transport these items from

its distribution facilities directly to its customers' job sites, which might be in almost any state. Three of the shippers also expressed a need for a carrier who would transport shipments of light, but bulky, items.

All of the shippers failed to list specific cities, other than Kansas City, as the origin and destination points for their shipments. Five of the shippers listed specific states as the origin and/or destination points.[3] Two other shippers also listed specific states, but added that their traffic moved from certain points in the listed states or state to "all points in the United States" or to "all 47 states."[4] Two shippers stated that their commodities moved both from Kansas City to points in the United States and from points in the United States to Kansas City.[5] And, three of the shippers stated only that their shipments moved "between points in the United States," or "between all points in the United States," or "all points between the 48 states of the Continental United States."[6]

---

VA, FL, LA, TX, AL, TN, GA, NC, SC, WI, MI, MN."

(k) Contractors Equipment and Rental, Inc. of Kansas City, Missouri, a buyer, seller, renter, and lessor of "construction and contractor's equipment," which stated that it would tender Ricky Shaw two loads per month of "machinery" to be transported "[b]etween points in TX, OK, PA, NC, AR, KS, CO, UT, CA, VA, MI, and Fl."

(l) United States Pipe & Foundry Company of Overland Park, Kansas, a manufacturer and supplier of iron pipe and cast-iron fittings, which stated that it would tender Ricky Shaw two truckloads per week of "ductile iron pipe and cast iron fittings" to be transported 65 percent of the time between Kansas City and "all points in the United States" and 35 percent of the time from plants in Alabama, California, New Jersey, and Tennessee to "points in the United States."

**3.** The five shippers are G.W. VanKeppel Company, Midwest Steel Corporation, Victor L. Phillips Company, Airmark Corporation, and Contractors Equipment and Rental, Inc. The following thirty states were specifically named by one or more of these shippers: Kansas; Missouri; Nebraska; Iowa; Arkansas; Oklahoma; Texas; Louisiana; Illinois; Ohio; Pennsylvania; New York; Massachusetts; Connecticut; New Hampshire; Delaware; New Jersey; Virginia; Florida; Alabama; Tennessee; Georgia; North Carolina; South Carolina; Wisconsin; Michigan; Minnesota; Colorado; Utah; and California. Thus, these shippers collectively specifically named individual states in all regions of the continental United States.

**4.** The two shippers are Contractors Supply Company and United States Pipe & Foundry Company.

**5.** These two shippers are Shaw Iron and Metal Corporation and Kenworth Truck Company. Shaw Iron and Metal's statement also included: "We travel *all over the United States* attending liquidation sales and auctions, buying [various items] .... Occasionally, we will need items picked up at auction sites and purchase sites *throughout the Country* and delivered directly to our customers which could be located *anywhere in the United States*.... The ability [of a carrier] to pick up and deliver *anywhere in the United States* is a critical factor." Kenworth further stated: "We also ship trucks and component parts between points in the U.S." (Emphasis added.)

**6.** The three shippers are Lee Equipment Company, S & W. Equipment/Tom Williams Company, and Shaw & Sons Equipment Rental, Inc. Other statements by these shippers included the following: Lee: "I buy and sell equipment *all over the United States* .... I will leave it at the purchase site until I sell it. Then I will

■ Fifteen carriers, including petitioner C & H Transportation Co., Inc. ("C & H") and J.H. Rose Truck Line, Inc. ("Rose"), two large and well-established nationwide carriers, opposed Ricky Shaw's application based upon its alleged lack of fitness to provide a responsive nationwide service, its alleged failure to show a need for the proposed service, and the potential loss of their revenue and traffic to Ricky Shaw. Petitioners asked the ICC to conduct an oral hearing on the application, but the ICC refused the request and decided the application under its modified procedure, 49 C.F.R. § 1100.43.[7] On February 4, 1981, the ICC's Review Board No. 2 granted Ricky Shaw the authority sought in its application, except that the Commission denied Ricky Shaw authority to transport lumber products. On May 14, 1981, the Review Board's decision was upheld by the ICC's Division No. 1, acting as an appellate division.[8]

Petitioners present two main contentions. First, they assert that Ricky Shaw failed to make a prima facie showing that it was able to provide a responsive nationwide service, and that approval of its application would serve a useful public purpose, responsive to a public demand or need. Second, assuming that Ricky Shaw made a prima facie showing, petitioners contend that they proved that approval of its application would have a material adverse effect upon their operations to an extent contrary to the public interest.

THE STANDARD OF REVIEW

■ A decision of the ICC is presumptively valid. *Interstate Commerce Commission v. City of Jersey City,* 322 U.S. 503, 512–13, 64 S.Ct. 1129, 1133–34, 88 L.Ed. 1420, 1427 (1944). Its decision can be set aside only if it is arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence. *Alamo Express, Inc. v. Interstate Commerce Commission,* 673 F.2d 852, 856 (5th Cir.1982).

"Under the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of

have it delivered to my customer.... I need a carrier that has the equipment and authority to pick up my machines at sale sites *through out the United States* and deliver it to my customers located *through out the United States.*" S & W. Equipment: "I buy and sell tanks *all over the United States.* Some are in very remote areas. Most tanks are overdimension .... I need a carrier that can pick up tanks *anywhere in the U.S.* and deliver them *anywhere in the U.S.* as this is the very nature of my business. I have used Ricky Shaw ... for intra-state shipments. They have the ability, equipment and desire to handle light, bulky, oversize loads." Shaw & Sons Equipment: "I rent and lease construction equipment ... to customers *all over the United States* .... I will leave it at the customer's location until I have another rental for it. Then I will move it from the first customers location *in one state* to the second customers location *in another state.* Another part of my business is buying and selling machinery. I buy and sell *all over the United States.* It's very common to buy a machine [and] ... leave the machine at the sale site until it is resold. Then deliver it from the sale or auction site to whatever point the buyer request ... we need a carrier that ... has the authority to pick up and deliver *anywhere in the United States.*" (Emphasis added.)

7. Section 1100.43 provides in part:

"The Commission may, in its discretion, order that a proceeding be heard under modified procedure if it appears that substantially all important issues of material fact may be resolved by means of written materials and that the efficient disposition of the proceeding can be made without oral hearing."

8. After passage of the Motor Carrier Act of 1980, the ICC issued a series of policy statements and guidelines to be followed in the adjudication of application proceedings. In *American Trucking Association, Inc. v. ICC,* 659 F.2d 452 (5th Cir.1981), *clarified and enforced through mandamus,* 669 F.2d 957 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983), this Court reviewed these statements and guidelines and held with respect to some of them that the ICC exceeded its authority under the amended Act. When the ICC granted Ricky Shaw's application, the now invalid rules were still in effect. This, however, of itself does not necessarily mandate a reversal or prevent our review. If the ICC's grant of authority satisfies the requirements of the Act, we must affirm the ICC's decision. *See J.H. Rose Truck Line, Inc. v. ICC,* 683 F.2d 943, 948 (5th Cir.1982).

judgment.... Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' *Citizens to Preserve Overton Park v. Volpe,* supra [401 U.S. 402] at 416, 28 L.Ed.2d 136 [91 S.Ct. 814 at 823]. The agency must articulate a 'rational connection between the facts found and the choice made.' *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 9 L.Ed.2d 207, 83 S.Ct. 239 [246] (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, *SEC v. Schenery Corp.,* 332 U.S. 194, 196, 91 L.Ed. 1995, 67 S.Ct. 1575 [1577] (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *Colorado Interstate Gas Co. v. FPC,* 324 U.S. 581, 595, 89 L.Ed. 1206, 65 S.Ct. 829 [836] (1945)." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.,* 419 U.S. 281, 284–85, 95 S.Ct. 438, 441, 42 L.Ed.2d 447, 455–56 (1974).

■ Substantial evidence, while something less than the weight of the evidence, is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Refrigerated Transport Company, Inc. v. Interstate Commerce Commission,* 663 F.2d 528, 531 (5th Cir.1981).

## A PRIMA FACIE CASE

Before issuing a certificate of public convenience and necessity, the ICC must find, in addition to a public need for the transportation services proposed by the applicant, that the applicant is "fit, willing, and able" to provide those transportation services, and to comply with the Interstate Commerce Act and the regulations of the Commission. 49 U.S.C. § 10922(a).[9] *Curtis, Inc. v. Interstate Commerce Commission,* 662 F.2d 680, 685 (10th Cir.1981).

■ Under 49 U.S.C. § 10922(b)(1),[10] an applicant has the burden to make a prima facie showing that he is "fit, willing, and able to provide the transportation authorized by the certificate," and that the proposed service will serve a "useful public purpose, responsive to a public demand or need." If the applicant makes this showing, then a presumption arises "that the grant of the application is consistent with the public convenience and necessity." *American Trucking Association, Inc. v. Interstate Commerce Commission,* 659 F.2d 452, 469 (5th Cir.1981), *clarified and enforced through mandamus,* 669 F.2d 957 (5th Cir.1982), *cert. denied,* —— U.S. ——,

---

**9.** Section 10922(a) provides:

"Except as provided in this section and section 10930(a) of this title, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II or III of chapter 105 of this title as a motor common carrier of passengers or water common carrier, respectively, if the Commission finds that—
"(1) the person is fit, willing, and able—
"(A) to provide the transportation to be authorized by the certificate; and
"(B) to comply with this subtitle and regulations of the Commission; and
"(2) the transportation to be provided under the certificate is or will be required by the present or future public convenience and necessity."

**10.** Section 10922(b) provides:

"(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds—
"(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and
"(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;
"unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity."

103 S.Ct. 1272, 75 L.Ed.2d 493 (1983). The burden therefore shifts to the protestant to show that the proposed service is "inconsistent with the public convenience and necessity." *Alamo,* 673 F.2d at 858; *Baggett Transportation Company v. United States,* 666 F.2d 524, 528 (11th Cir.1982).

A. *Operational Feasibility.* Petitioners argue that Ricky Shaw failed to demonstrate to the Commission its ability or fitness to perform a nationwide service. In their protests before the ICC, petitioners' argument, as here, centered on Ricky Shaw's limited financial resources, the small fleet of power units and trailers it owns, its single terminal facility, and its failure to propose a plan for conducting a nationwide service, responsive to the needs of all or most of its potential customers. In rejecting this argument, the Review Board stated:

"The protestants also question applicant's ability to perform such a service, but the Commission does not normally consider this a decisive factor. The practical limitations upon applicant's provision of service to *all the shippers encompassed by this application* will serve to protect the protestants' stated interest in traffic they are already transporting for other accounts." (Emphasis added.)

Petitioners attack the first statement of the above-quoted portion of the Review Board's opinion, which they claim shows that the ICC erred in failing to consider, as a decisive factor, Ricky Shaw's ability to perform the proposed service. We disagree.

The Review Board expressly found that Ricky Shaw "is fit, willing, and able properly to perform such service and to conform to the requirements of Title 49, subtitle IV, U.S.Code, and the Commission's Regulations." [11] Given the context in which the Review Board stated that Ricky Shaw's ability was not a decisive factor, the statement was not erroneous, for we consider it to be directed to petitioners' contention that

Ricky Shaw was required, but failed, to demonstrate the operational feasibility, from a quantitative standpoint, of its proposal to conduct operations nationwide serving the needs of all or most of its potential customers, a factor the ICC is not required to consider as controlling. *Central Freight Lines, Inc. v. United States,* 669 F.2d 1063, 1071 (5th Cir.1982); *Star Delivery & Transfer v. United States,* 659 F.2d 81, 85–86 (7th Cir.1981). In fact, the size of an applicant at the time he files an application is not necessarily an element of the fitness determination. Nor has the Commission ever established a fixed minimum dollar limitation as a prerequisite for a carrier's entry into the regulated trucking industry. *Consolidated Carrier, Inc., Common Carrier Application,* 131 M.C.C. 104, 108 (1978); *David W. Hassler, Inc., Extension-Petroleum Products,* 128 M.C.C. 864 (1978).

In *Steere Tank Lines, Inc. v. Interstate Commerce Commission,* 675 F.2d 103 (5th Cir.1982), the protestants, as here, argued that the applicant was not sufficiently equipped to provide the proposed service between points in thirteen states, because it had only one terminal facility and a limited number of trucks. The ICC rejected this argument, and its order granting the authority sought by the applicant was upheld by this Court on appeal.

"A common carrier is free to carve out as large or as small a niche as it feels appropriate. *Pennsylvania Railroad v. Puritan Coal Mining Co.,* 237 U.S. 121, 133, 35 S.Ct. 484, 488, 59 L.Ed. 867 (1921). Its duty is only to 'serve all, up to the *capacity of his facilities* without discrimination and for reasonable pay.' *Michigan P.U.C. v. Duke,* 266 U.S. 570, 577, 45 S.Ct. 191, 193, 69 L.Ed. 445 (1925). While the provisions of the Motor Carrier Act may well require that no material type of the transportation authorized by the certifi-

---

11. Although the licensing requirements of 49 U.S.C. § 10922(b)(1) were amended by Congress to make it easier for new trucking companies to enter the market, the statute retains the traditional test that a certificate shall only

be issued "if the Commission finds—that the person is fit, willing, and able to provide the transportation to be authorized by the certificate." *American Trucking,* 659 F.2d at 469.

cate be beyond the carrier's fitness, willingness, and ability, there is no requirement that the carrier be able, quantitatively, to perform all or any substantial part of the transportation in all covered areas." 675 F.2d at 105.

See also American Central Transport, Inc., Extension-Substituted Rail Service, 132 M.C.C. 664 (1981).

■ To satisfy the "fit, willing, and able" requirement, the applicant must show (1) that it has the financial fitness or ability to perform the character of service it seeks to provide; (2) that it is willing to comply with the Interstate Commerce Act and the rules and regulations promulgated thereunder; and (3) that it has the ability to perform the proposed service in a proper and safe manner for the protection of the public. Curtis, 662 F.2d at 685; Consolidated Carriers, 131 M.C.C. at 108; Transportation Freight Lines, Inc., Extension-Columbus, Georgia, 131 M.C.C. 640, 643–44 (1979); American Central Transport, 132 M.C.C. at 666. A showing of fitness need not be elaborate. Steere Tank Lines, Inc. v. Interstate Commerce Commission, 666 F.2d 255, 258 (5th Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1264, 75 L.Ed.2d 499 (1983).

■ Here, the record shows that Ricky Shaw is in a healthy financial state with the resources to purchase or lease additional equipment when and if needed to serve shippers upon reasonable request; that it is equipped to perform, in the area covered by its certificate, the type of transportation authorized; that it is willing to adhere to

the Commission's rules and regulations; and that it has the ability to conduct operations in a safe manner. Petitioners produced no evidence to the contrary.[12] That Ricky Shaw had the ability to conduct the proposed service is further supported by the fact that it already possessed nationwide authority to transport, for the Defense Department, many of the same products listed in its application.[13]

We therefore hold that the ICC's Review Board applied the correct standards to find that Ricky Shaw was "fit, willing, and able" to perform its proposed service, and that there is substantial evidence to support its finding.

B. Public Need. Petitioners contend that there is insubstantial evidence to support the ICC's broad grant of authority to Ricky Shaw. Petitioners' first argument in support of this contention is that the supporting shippers' statements failed to establish a public need for Ricky Shaw's services; and that the supporting shippers were not representative of the needs of the shipping public within the scope of its application. We disagree.

Several of the shippers complained of problems in obtaining carrier commitments to haul their shipments when needed. Seven of the shippers expressed a need for a carrier who could transport their products or equipment over irregular routes from purchase site to customer, or from customer to customer, in specific states or between points in the forty-eight contiguous states without ever returning them to Kansas

---

12. Under 49 C.F.R. § 1100.55 et seq., petitioners could have filed a petition with the Commission seeking appropriate discovery procedures to challenge the assertions made in Ricky Shaw's application, or to cross-examine its supporting shippers.

13. We also note that several of the supporting shippers had used Ricky Shaw and/or expressed their belief it could provide the service they needed. VanKeppel stated it had used Ricky Shaw "and we were completely satisfied .... We know that Ricky Shaw & Sons can meet our need for additional carriers." Contractors Supply's statement reflects, "We are very pleased with his [Ricky Shaw's] service."

Shaw Iron and Metal relates that "Ricky Shaw ... has the type of equipment we need." S & W. Equipment says it has used Ricky Shaw and "they have the ability, equipment and desire to handle light, bulky, oversize loads." The Victor L. Phillips Company states it has used Ricky Shaw "and we are real happy with their service and equipment." Airmark Corporation has used Ricky Shaw "for several years. They do an outstanding job.... They have special tank trailers which can handle our light weight loads." Contractors Equipment and Rental, Inc. has likewise used Ricky Shaw and states, "I know they can supply the kind of service I need."

City.[14] The remaining shippers, some of whom expressed a need for transportation of their light, but bulky, products or equipment, testified to a need for a carrier to transport their items between points in the United States or between points in specific states.[15]

After considering this evidence, the Review Board stated:

"It is true that much of the traffic will originate or be destined for Kansas City; however, the express need of the shippers is for a broader and therefore more flexible service. Indeed, several shippers refer to specific business situations which necessitate movement of their goods between points located throughout the United States, and we cannot ignore those statements simply because the protestants discount their significance."

We hold that the shippers' statements provided the ICC with substantial evidence of their need for a carrier with nationwide authority to transport their goods over irregular routes.

■ As to petitioners' argument that the supporting shippers are not representative of the needs and requirements of the shipping public generally, we consider it to be without merit, for the need for nationwide authority was expressed by Kansas City area shippers, and we see no reason why the Commission could not grant Ricky Shaw nationwide authority to satisfy their need whether or not a similar need was felt by shippers of similar goods in the rest of the nation.

■ Petitioners' next argument is more weighty. They assert that because the supporting shippers failed to list specific cities as origin or destination points for their products or equipment, that the ICC was not advised of the present or future di-

rection of traffic, and that there was therefore insubstantial evidence of the geographical scope of the public need shown for the ICC to have made a rational determination respecting the breadth of authority required to satisfy that need. *See Refrigerated Transport Co., Inc. v. Interstate Commerce Commission,* 663 F.2d 528, 531 (5th Cir.1981).[16] Thus, the petitioners' argument is that the ICC's grant of nationwide authority to Ricky Shaw is unsupported by substantial evidence, and therefore arbitrary and capricious. We disagree.

Before passage of the Motor Carrier Act of 1980, the ICC generally applied the criteria enunciated in *Novak Contract Carrier Application,* 103 M.C.C. 555 (1967), to determine whether there was sufficient information provided by the applicant and his supporting shippers to warrant a grant of the requested authority.

"The *Novak* guidelines required a minimum showing of the commodity shipped or received, points to or from which traffic moved, volumes of freight to be tendered to applicant, transportation now used for moving the involved traffic, and deficiencies in existing service. These were useful, but they could not be strictly applied. Courts reminded us that the proper purpose of these guidelines was to provide the Commission with sufficient information to determine the basic nature and extent of the public transportation needs, and not to serve as procedural hurdles. *See Twin City v. United States,* 360 F.Supp. 709, 712–13 (D.Minn.1972), and *Claycon Transports Corporation, Ext.,* 126 M.C.C. 420, 423 (1977).

". . . .

"Keeping in mind Congress' clearly stated intent to ease entry into the transportation industry, and an applicant's reduced

---

14. The seven shippers are Shaw Iron and Metal Corporation, Lee Equipment Company, S & W. Equipment/Tom Williams Company, Shaw & Sons Equipment Rental, Inc., Victor L. Phillips Company, Contractors Equipment and Rental, Inc., and United States Pipe & Foundry Company.

15. The remaining shippers are G.W. VanKeppel Company, Contractors Supply Company, Kenworth Truck Company, Midwest Steel Corporation, and Airmark Corporation.

16. We note, however, that in *Refrigerated Transport Co., Inc.* the ICC decision was rendered before the effective date of the Motor Carrier Act of 1980. 663 F.2d at 531 n. 7.

evidentiary burden under the new act, we will fashion new guidelines to provide the Commission with sufficient information to make a reasoned determination that a proposed service will serve a useful public purpose responsive to a public demand or need. Further, *we do not intend these guidelines to result in rigidly focused inquiries as to entry standards,* which often occur under a *Novak* analysis. Nevertheless, we do expect applicants to show this by reliable and probative evidence from whatever source they believe appropriate.

" . . . .

"If applicants rely on shipper support, the evidence should tell us something about the present or future direction, quantity, and type of traffic involved. *This evidence need not be precise.* In the past we have accepted shipper contentions that development of new product lines or new marketing strategies preclude specification of commodities, volumes, or points involved. Given the policies of granting broad applications, *the latitude for acceptable imprecision is even wider.* However, shipper supported applications should provide sufficient information for us to determine the basic nature of the public's transportation needs or demands of which their supporting shipper statements are representative." *Prefab Transit Company, Extension-Nationwide General Commodities,* 132 M.C.C. 409, 412–13 (1981) (emphasis added).

The record shows that seven of the shippers engage in the practice of moving their commodities from auction site to customer, or from customer to customer, and this makes it difficult for the shippers who operate in that manner to be precise about particular origins and destinations. That certain business practices may cause such imprecision was recognized by the ICC in *Amber Delivery Service, Inc., Common Carrier Application,* 131 M.C.C. 801, 808–09 (1979):

"When considering this evidence it must be remembered that Speigel and Encyclopedia Britanica have lading moving to private residences. This type of traffic does not lend itself to precise identification of points to be served."

The type of traffic involved in this case presents the same character of problem. The shipments are irregular, and they are unpredictable both in their origin and destination. They are therefore unlike other types of traffic that lend themselves to more precise information. This business practice, however, does not relieve the shippers of the necessity to list at least some of the areas or states in which at least some of their goods have previously moved. Here, one of the shippers stated that its goods moved "from points in the United States to Kansas City and from Kansas City to points in the United States." Another shipper used virtually the same language. This, *by itself,* tells the ICC very little, *if anything,* about the present or future direction of the traffic. Other shippers, however, listed a total of thirty states, scattered throughout all regions of the forty-eight contiguous United States, as the origin and destination points of their shipments. Still other shippers stated, in effect, that this traffic moved in all forty-eight states.

Because most of the supporting shippers engage in the practice of shipping their commodities from customer to customer, or from purchase site to customer, and indicated that they did so on a truly nationwide basis, and because some of them did list specific states,[17] which are scattered throughout all regions of the forty-eight contiguous United States, as the origin and destination points of their shipments, we hold that the shippers' statements provided substantial evidence of the nationwide character of their shipping needs sufficient to support the ICC's decision granting Ricky Shaw nationwide authority. We wish to emphasize, however, that some of the evidence respecting the geographic scope of the need shown is very weak and unsatisfactory standing alone, but that nevertheless the showing made overall, coupled with the business practices used by a majority of

**17.** *See* notes 2, 3, 5, and 6, *supra.*

the shippers, constitutes substantial evidence at least minimally sufficient to uphold the grant of nationwide authority.

### THE PROTESTANTS' CASE

 Having determined that Ricky Shaw provided the ICC with substantial evidence of a public need, and that it was "fit, willing, and able" to provide a service responsive to that need, we now consider whether petitioners established that approval of Ricky Shaw's application would harm them to an extent contrary to the public interest.

In their protest, petitioners produced evidence showing the amount of traffic and revenue estimated by them to be lost to Ricky Shaw if its application were approved. Petitioners also provided estimates of service curtailments and of the number of employees who might have to be dismissed if approval were given, and data respecting the operational inefficiency and fuel inefficiency which approval of Ricky Shaw's application would cause them.[18] Petitioners argue that this evidence establishes that approval of Ricky Shaw's application would be contrary to the public interest. We disagree.

Section 10922(b)(2)(B) of 49 U.S.C. provides that the ICC shall consider the effect of the issuance of a certificate on existing carriers, except that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.

Here, the Review Board determined that:

"The practical limitations upon applicant's provision of service to all the shippers encompassed by this application will serve to protect the protestants' stated interest in the traffic they are already transporting for other accounts.

"A grant of this authority should have no material adverse effect upon any protestant, none of which has provided service to any significant extent for the supporting shippers, and none of which has demonstrated that whatever traffic this fledgling carrier may attract will harm its operations to an extent contrary to the public interest."

C & H's protest shows that it maintains forty-one terminals located throughout the United States, and that it operates 1,714 power units and approximately 2,700 semi-trailers. During the twelve-month period before Ricky Shaw's application was filed, C & H had revenues of $72,870,960. In the first six months of 1980, C & H served 20,946 customers throughout the United States. Three of the twelve supporting shippers stated that they used C & H to transport their commodities.

In its protest, Rose testified that it maintains fourteen permanent terminals located in Texas, Louisiana, Oklahoma, Illinois, California, Washington, Utah, Florida, and Georgia. Rose has permanent interstate operating authority in forty-nine states. During 1977, Rose had total gross revenues of $21,712,889, of which approximately $21,005,692 was derived from interstate traffic within the scope of Ricky Shaw's application. Rose also maintains a sizable fleet of power units and trailers. None of the supporting shippers stated that they used Rose.

In the past, ICC decisions have emphasized that "the comparative size of the applicant and protestants is a good starting point when assessing the probability of harmful diversion." *Saia Motor Freight Line, Inc., Extension-Dallas*, 130 M.C.C. 409,

---

18. C & H estimated that Ricky Shaw would be able to divert not less than three percent of its corporate revenue in a twelve-month period. C & H claims that the revenue loss of three percent would cause it to lay off or dismiss three percent of its employees and three percent of the owner-operators who are currently on lease to it. Rose estimated that 96.7 percent of its total gross revenues were subject to diversion to Ricky Shaw. Rose, however, anticipates that up to ten percent of its total traffic could be diverted to Ricky Shaw. Petitioners' arguments in this respect suggest a distinctly stronger and more capable Ricky Shaw than do their arguments, which we previously addressed, that there is no substantial evidence that Ricky Shaw is able to provide the transportation authorized in the certificate granted it.

422 (1978). The ICC could properly find it unlikely that Ricky Shaw would cause diversion of any significant portion of petitioners' traffic, given the size of Ricky Shaw as compared to them, or that any diversion would be of such character and significance as to be contrary to the public interest. We hold therefore that the Commission's finding that approval of Ricky Shaw's application will not be inconsistent with the public interest is supported by substantial evidence.

## SUBSIDIARY FINDINGS

Petitioners contend that the ICC violated the due process clause of the Fifth Amendment to the United States Constitution and the Administrative Procedure Act, 5 U.S.C. § 557(c), by failing to make sufficient findings respecting (1) Ricky Shaw's fitness to provide the proposed service, (2) the effect of Ricky Shaw's proposed service on petitioners' operations, and (3) whether approval of Ricky Shaw's application would satisfy *all* the policy factors of the National Transportation Policy Act, 49 U.S.C. § 10101(a)(7).[19]

Although the Review Board's opinion respecting Ricky Shaw's fitness and the alleged adverse effects of his proposal on petitioners' operations are not as detailed as we would like, the opinion makes findings sufficient to resolve the material issues presented to the Review Board, and the opinion discloses the essential basis for the Board's decision. *Trailways, Inc. v. Interstate Commerce Commission,* 676 F.2d 1019, 1022 (5th Cir.1981).

"In summary, 'we can discern in the Commission's opinion a rational basis for its

treatment of the evidence, and the arbitrary and capricious test does not require more.'" *Trailways, Inc. v. Interstate Commerce Commission,* 681 F.2d 252, 254 (5th Cir.1982).

Petitioners' argument respecting the necessity for findings under the National Transportation Policy Act has been rejected by this Court in *Alamo Express, Inc. v. Interstate Commerce Commission,* 673 F.2d at 860:

"The National Transportation Policy must guide the ICC in all its decisions. *However, the ICC need not explicitly discuss in its decision each factor enumerated in section 10101.* All that is necessary is that the essential basis of the ICC's rationale be clear enough so that a court can satisfy itself that the ICC has performed its function." (Emphasis added.)

In *Alamo,* the Court held that it was apparent that the ICC found that the applicant's proposed service would be consistent with the National Transportation Policy Act "because it would 'meet the needs' of the shipper," which is one of the factors of 49 U.S.C. § 10101(a)(7). In the instant case, the Review Board in its opinion found that "the authority sought is commensurate with the express needs of the supporting shippers." *See Baggett,* 666 F.2d at 530–31. We hold that the ICC's consideration of and findings respecting 49 U.S.C. § 10101(a)(7) were sufficient. *See J.H. Rose Truck Line, Inc. v. Interstate Commerce Commission,* 683 F.2d 943, 951–52 (5th Cir.1982); *Trailways, Inc. v. Interstate Commerce Commission,* 681 F.2d at 254.[20]

---

**19.** Section 10101(a)(7) provides:

"[W]ith respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to (A) meet the needs of shippers, receivers and consumers; (B) allow a variety of quality and price options to meet changing market demands and the diverse requirements of the shipping public; (C) allow the most productive use of equipment and energy resources; (D) enable efficient and well-managed carriers to earn adequate profits, attract capital, and maintain fair wages and working condi-

tions; (E) provide and maintain service to small communities and small shippers; (F) improve and maintain a sound, safe, and competitive privately-owned motor carrier system; (G) promote greater participation by minorities in the motor carrier system; and (H) promote intermodal transportation."

**20.** Petitioners' claims that granting the application would result in fuel and equipment inefficiencies related solely to projected increases in "deadheading" and idle equipment in their own operations which projections in turn were based entirely on assumptions as to the amount

## AN ORAL HEARING

Petitioners' final contention is that they were denied due process of law because the ICC erroneously denied their request for an oral hearing when there existed disputed issues of material fact.[21] We disagree.

■ The decision whether to grant an oral hearing is generally a matter for the ICC's discretion. The ICC's policy is not to grant an oral hearing in every case though there may be disputed issues of material fact.

"Rather the Commission handles application proceedings without oral argument 'if at all possible' with oral hearings limited to 'extraordinary cases.' 49 C.F.R. §§ 1100.251(c) & .252(f)(1). Under its rules, the Commission may, in its discretion, hear a case under the so-called 'modified procedure,' *i.e.*, without an oral hearing 'if it appears that *substantially all* important issues of material fact may be resolved by means of written materials and that the efficient disposition of the proceeding can be made without oral hearing.' *Id.* § 1100.43 (emphasis added)." *Trailways, Inc. v. Interstate Commerce Commission,* 681 F.2d at 254.[22]

■ We hold that the ICC did not abuse its discretion in failing to grant petitioners' request for an oral hearing in the circumstances of this case.[23]

21. Petitioner C & H claimed that the following *issues* were in dispute: (1) whether applicant was fit to provide the proposed services; (2) whether the applicant made a prima facie showing that the proposed service would serve a useful public purpose; and (3) whether or not the proposed service was inconsistent with the public convenience and necessity even if the applicant demonstrated that the proposed service would serve a useful public purpose. C & H also listed fifteen areas in which it wanted to cross-examine Ricky Shaw's witnesses.

Petitioner Rose requested an oral hearing so that it could cross-examine the applicant regarding the nature and extent of its present operations, the location of applicant's terminal facilities and a description of such facilities as well as a description of the pertinent equipment, and finally, a description of the operational feasibility of the applicant.

As the requests of Rose and C & H demonstrate, the facts themselves are not in dispute, and their arguments went instead to the weight of the evidence.

22. *See also Steere Tank Lines, Inc. v. ICC,* 687 F.2d 104, 107 (5th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1430, 75 L.Ed.2d 790 (1983); *Bonney Motor Exp., Inc. v. United States,* 640 F.2d 646, 649–50 (5th Cir.1981); *Frozen Food Express, Inc. v. United States,* 346 F.Supp. 254, 260–61 (W.D.Tex.1972) (three-judge court).

23. We observe that petitioners did not seek an oral hearing on the basis of any challenge to the veracity of the statements of intervenor or its supporting shippers. "Witness" credibility was not in issue. We also note that petitioners apparently did not attempt to utilize the Commission's discovery procedure (49 C.F.R. §§ 1100.56–.57), by seeking to take depositions of, or present interrogatories to, intervenor or

of business Ricky Shaw would divert from them. Of Ricky Shaw's twelve supporting shippers, only three had used C & H and none had used Rose. Ricky Shaw's gross revenues were less than one half of one percent of C & H's and less than one and one half percent of Rose's. Petitioners claimed Ricky Shaw would be unable to furnish the service authorized. Yet, C & H, in its claims concerning fuel and equipment inefficiencies, assumed Ricky Shaw would divert three percent of its revenues, and Rose assumed ten percent of its revenues would be diverted (they also assumed that diversion would increase deadheading on a one-to-one basis). We think the Commission adequately addressed this contention by its statements noting "[t]he practical limitations upon applicant's provision of service"; that the authority granted "is commensurate with the expressed needs of the supporting shippers"; that "grant of this authority should have no material adverse effect upon any protestant, none of which has provided service to any significant extent for the supporting shippers and none of which has demonstrated that whatever traffic this fledgling carrier may attract will harm its operations to an extent contrary to the public interest"; and that "[t]his action will not significantly affect ... conservation of energy resources." Petitioners did not present any claim or evidence of anything inherently wasteful or inefficient in the type of service which the supporting shippers' statements indicated that Ricky Shaw would be providing, or anything that suggested that granting the application would have an effect on them or others different from that which it might be assumed any slight increase in competition would have. As the Motor Carrier Act of 1980 concededly had as one of its principal purposes the easing of entry into this business, we believe that the Commission's findings respecting these contentions of petitioners were sufficient under the circumstances.

The order of the ICC granting Ricky Shaw's application is affirmed.

AFFIRMED.

THORNBERRY, Circuit Judge, concurring in part and dissenting in part:

Except for the one reservation set forth below, I concur in this opinion. However, I cannot go along with the opinion in its acceptance of the conclusory manner in which the Commission appears to have considered the mandates outlined in the National Transportation Policy Act, 49 U.S.C. § 10101(a). Relying on *J.H. Rose Truck Line, Inc. v. I.C.C.*, 683 F.2d 943 (5th Cir. 1982), and *Alamo Express, Inc. v. I.C.C.*, 673 F.2d 852 (5th Cir.1982), the opinion holds that as long as the needs of the shippers are satisfied, the Commission need not make any additional findings under the National Transportation Act. I cannot agree.

While it is true that the Commission need not examine *each* of the factors outlined in section 10101(a)(7), *Alamo Express,* 673 F.2d at 860, and that some of the factors may reflect conflicting interests, *I.C.C. v. J–T Transport Co.*, 82 S.Ct. 204, 209 (1961), the Commission nonetheless has the duty to *identify* the competing interests, judge them, and strike a balance. *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 95 S.Ct. 438, 446 (1974). *See also Baggett Transportation Co. v. U.S.*, 666 F.2d 524, 531 (11th Cir. 1982).

In this case, the protestants presented credible, and apparently uncontradicted evidence that fuel and equipment inefficiencies would result from the grant of Shaw's application. The Commission did not specifically address this issue. Its' decision merely states in broad and conclusory terms that "[t]his action will not significantly affect ... the conservation of energy resources." This superficial treatment goes counter to one of the mandates of the Commission, which is "to promote safe, adequate, *economical,* and *efficient* transportation." 49 U.S.C. § 10101(a)(2). (emphasis added) In affirming this portion of the Commission's decision, the opinion holds that the goals of the National Transportation Policy Act are satisfied as long as the needs of the shipper are satisfied. This holding leads to a result inconsistent with legislative policy by equating the needs of the shipper with the transportation needs of our nation. Stated differently, since a carrier routinely submits in his application statements from shippers demonstrating the *need* for his services, it follows from this opinion that such a demonstration of public need would amount to automatic satisfaction of the *public interest* as embodied in the National Transportation Policy Act.

My conclusion is consistent with the cases cited in the opinion. In *Rose,* this court held that a finding on *two* of the factors outlined in section 10101(a)(7), enhancement of competitive opportunities and achievement of efficient use of equipment, satisfied the requirements of the National Transportation Act. 683 F.2d at 951. In *Alamo Express,* the court held that a finding that the needs of the shipper were met, *coupled with* the lack of any credible evidence on future harm,[1] also satisfied the

the supporting shippers. *See Frozen Foods Express, Inc. v. United States,* 346 F.Supp. 254, 261 (W.D.Tex.1972) (three-judge court). At oral argument, petitioners suggest certain deficiencies in these procedures, particularly in the light of the "fast track" upon which applications such as intervenor's are processed and acted on by the Commission. However, we cannot judge these matters in the abstract, and absent an attempt to invoke the discovery procedures which shows them to be prejudicially deficient in a particular case, we are unwilling to merely assume that resort to them would be futile, or that the ICC would not, on proper application and showing, allow sufficient time for their useful employment. Under the circumstances of this case, in light of the reasons why an oral hearing was sought and the lack of any veracity or credibility challenges, we will not assume that any substantial need for an oral hearing would not have been obviated by use of discovery procedures.

1. The protestant in *Alamo Express* alleged that granting the requested permit would cause: (1) impairment of service to small communities, (2) impairment of its ability to earn profits and pay fair wages, and (3) adverse impact on the fuel efficiency of its operations. These alleged harms are some of the factors outlined in the

requirements of the Act. Here, protestants presented credible evidence on future harm, which the Commission rejected in the most general and conclusory fashion. I would remand the case to the Commission for additional findings consistent with this dissent.

National Transportation Policy Act, 49 U.S.C. § 10101(a)(7)(E), (C), and (D). 673 F.2d at 860.