**STEERE TANK LINES, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**Nos. 81–4293, 81–4326 and 81–4396.**

United States Court of Appeals,
Fifth Circuit.

Sept. 19, 1983.

**1302**

Hugh T. Matthews, Dallas, Tex., for petitioner.

Colleen J. Bombardier, Sidney L. Strickland, Jr., ICC, Robert B. Nicholson, James H. Laskey, Attys., U.S. Dept. of Justice, Washington, D.C., for respondents.

Edward J. Kiley, Washington, D.C., for Truck Transport Inc. intervenor for petitioner.

Clyde N. Christey, Topeka, Kan., for Keim Transp. Inc., intervenor for respondents.

Before BROWN, GEE and JOLLY, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

With hope, this case will signal the demise of a virulent strain of ICC cases which has recently plagued the motor carrier industry. Frequent outbreaks have occurred over the last two years[1] leaving trucking firms languishing with ailing certifications. Once again, this Court faces a possible epidemic of infirm certificates and swollen transportation authority this time involving Keim Transportation, Inc. (Keim), Energy Carriers, Inc. (Energy Carriers),[2] and Scheduled Truckways, Inc. (Scheduled).[3]

---

1. *Steere Tank Lines, Inc. v. ICC,* [No. 82–4309] 703 F.2d 927 (5th Cir.1983); *Steere Tank Lines, Inc. v. ICC,* [No. 81–4328] 694 F.2d 413 (5th Cir.1982); *Steere Tank Lines, Inc. v. ICC,* [No. 81–4497] 687 F.2d 104 (5th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1430, 75 L.Ed.2d 790 (1983); *J.H. Rose Truck Line, Inc. v. ICC,* 683 F.2d 943 (5th Cir.1982); *American Trucking Associations, Inc. v. ICC,* 682 F.2d 487 (5th Cir.1982); *Steere Tank Lines, Inc. v. ICC,* [No. 81–4157] 675 F.2d 763 (5th Cir.1982); *Steere Tank Lines, Inc. v. ICC,* [No. 81–4261] 675 F.2d 103 (5th Cir.1982); *Steere Tank Lines, Inc. v. ICC,* [No. 81–4436] (5th Cir. Aug. 11, 1982) (unpublished); *Steere Tank Lines, Inc. v. ICC,* [No. 81–4183] 667 F.2d 490 (5th Cir.1982); *Steere Tank Lines, Inc. v. ICC* [No. 81–4169] 666 F.2d 255 (5th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1264, 75 L.Ed.2d 499 (1983); *American Trucking Associations, Inc. v. ICC,* 659 F.2d 452 (5th Cir.1981) *clarified and enforced through mandamus,* 669 F.2d 957 (5th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983).

2. The motion of petitioner Steere to dismiss the intervention of Energy Carriers and to strike its pleadings and briefs is granted. This ruling, of course, does not prevent the court from considering independently the arguments or analysis contained therein.

3. On January 28, 1982, respondents requested that the *Scheduled* case, No. 81–4396, be remanded to the Commission for further consideration. Respondents' motion to remand was initially denied by this Court by order dated February 19, 1982. Respondents filed a motion for reconsideration of the motion to remand which was carried with the case. Because the Commission has voted to reopen the proceeding in *Scheduled,* we grant the motion and remand case No. 81–4396 for further consideration by the Commission. For this reason, we

According to the petitioner, Steere Tank Lines, Inc. (Steere), the removal of all or part of their requested and granted authority is the only remedy. The Interstate Commerce Commission, on the other hand, gave the group a clean bill of health. Thus, Steere now seeks a second opinion from this Court. Our own examination of these cases reveals that, although some surgery is required, the ICC's diagnosis was supported by substantial evidence. We affirm in part and remand.

## I. Case History

### A. The Motor Carrier Act

Just as medical complaints can often be traced to a single virus or trauma, the origins of these cases may be found in a single act of Congress—the Motor Carrier Act of 1980.[4] Section 5 of the Act, of primary importance here, was enacted to make it easier for new trucking companies to enter the market and for existing ones to expand their operations.[5]

Traditionally, persons wanting to enter the business of furnishing interstate transportation for hire as motor common carriers were required to demonstrate not only that they were "fit, willing and able" to provide the transportation to be authorized, but also that the operations for which such authority was sought were required "by the present or future public convenience and necessity." 49 U.S.C. § 10922(a)(2). Congress entrusted the definition of "public convenience and necessity" to the Commis-

sion which set forth its interpretation in Pan American Bus Lines Operations, 1 MCC 190, 203 (1936):

> The question, in substance, is whether the new operation or service will serve a useful public purpose, responsive to a public demand or need; whether this purpose can and will be served as well by existing lines or carriers; and whether it can be served by applicant with the new operation or service proposed without endangering or impairing the operations of existing carriers contrary to the public interest.

Since 1936, the ICC has chipped away at its initial requirements. In Ex Parte No. MC–121, Policy Statement on Motor Carrier Regulation, 44 Fed.Reg. 60296 (Oct. 19, 1979), for example, the Commission excised the requirement that the adequacy of existing service be a factor in considering applications.[6]

In adopting the Motor Carrier Act of 1980, Congress finally rejected the historical approach altogether. "Based on the extensive record developed at the hearings, the Committee clearly rejects the historical approach of the Commission towards applications for authority to operate as motor common carriers of property. Section 5 [the motor carrier provisions] reflects the Committee's strong belief that increased competition and potential competition will bring about the most efficient and economical

will include no discussion of the facts or issues involved in the Scheduled matter in this opinion.

4. Pub.L. No. 96–296, 94 Stat. 793 (1980) (codified at 49 U.S.C. § 10101 et seq. 1983 Partial Revision) [hereinafter cited as the MCA]. For an excellent discussion of the Act, see American Trucking Associations, 659 F.2d 452.

5. H.R.Rep. 1069, 96 Cong. 2d Sess. 12, reprinted in 1980 U.S.Code Cong. & Ad.News 2283, 2294 [hereinafter cited as House Report]. See S.Rep. No. 641, 96th Cong., 2d Sess. (1980), set forth in Traffic World's Motor Carrier Act Monitor, Oct., 1980, § 3, p. 4; see also 126 Cong. Rec. S. 7685 (daily ed. June 20, 1980).

6. See Assure Competitive Transportation, Inc. v. United States, 635 F.2d 1301 (7th Cir.1980),

which upheld the Commission's policy statement, MC–121.

In addition, the Commission proposed a master certification approach in which a general finding of public convenience and necessity is made governing a certain area of transportation and certification is accomplished by filing within the limits of that general finding. Ex Parte No. MC–135, Master Certificates and Permits, noted in House Report, supra note 5, at 13, 15. Master licensing is prohibited by 49 U.S.C. § 10922(b)(3) which states that the Commission may not make findings of public need based upon general findings developed in rule making proceedings. See also Aero Mayflower Transit Co. v. ICC, 686 F.2d 1 (D.C.Cir. 1982).

delivery of transportation service to the public." *House Report, supra* note 5, at 14.

In Section 10922(b)(1) (West Supp.1982) of the MCA,[7] Congress set forth the entry standards to be used by the Commission to decide whether or not to issue a certificate authorizing operation as a motor common carrier of property. The Act retains the traditional requisite that all applicants must be fit, willing and able. It revises, however, the public convenience and necessity requirement. Specifically, it reduces the burden of proof on persons supporting the application. Under this standard, proponents of the application must show only that the service they propose will serve a useful public purpose, responsive to a public demand or need. *See House Report, supra* note 5, at 14. *See also Kenosha Auto Transport Corp. v. United States,* 684 F.2d 1020, 1027–28 (D.C.Cir.1982) for a discussion of Senate debate on the MCA. If the Commission finds that the carrier has made a *prima facie* showing to such effect, it will grant the certificate unless protesting carriers show that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity. 49 U.S.C. § 10922(b)(1). *Steere Tank Lines,* [No. 81–4497] 687 F.2d at 105; *Steere Tank Lines,* [No. 81–4261] 675 F.2d at 104; *American Trucking Associations,* 659 F.2d at 469–70.

It was under the new standards of the 1980 Act that Keim and Energy Carriers filed applications for expanded transportation authority.

### B. *Keim's Application*

Keim sought authority to transport

(1) Gypsum, gypsum products, building materials, paper and paper products, chemicals and plastic products and

(2) Materials, equipment and supplies used in the manufacture, installation, distribution and sale of the commodities in (1) above, between points and places in the United States, except Alaska and Hawaii.

At the time of its application, Keim had authority to operate as a motor carrier transporting iron and steel articles (except "Mercer" and earth drilling commodities) over irregular routes from points in the commercial zones of Sterling and Chicago, Illinois, and Union, Missouri, to points in Kansas, under continuing contract(s) with Steel Pipe & Supply, Inc., of Manhattan, Kansas. *See* Keim Transportation, Inc., ICC Permit MC–148548 (Sub 1F).

In this capacity, Keim operated 59 tractors and 85 trailers. It operated no tank vehicles. According to the supporting affidavit of Keim's President, Glen Keim, all of the tractors operated by Keim were suitable for the transportation of the commodities described in the application. He pointed out that the 44 flatbed trailers were equipped with removable sides, boomers, chains and tarps and were therefore suitable for the transportation of most of the commodities involved. In addition, Glen Keim suggested that the company's grain trailer and end-dump hydraulic trailer could be used for bulk materials. Glen Keim

---

**7.** (b)(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

stated that Keim was in compliance with and would continue to comply with ICC rules and regulations.

One shipper, Georgia-Pacific Corporation (Georgia-Pacific) supported the application.[8] At the time of Keim's application, it served Georgia-Pacific out of its (Georgia-Pacific's) plants at Blue Rapids, Kansas; Cuba, Missouri; and Acme, Texas. Georgia-Pacific cited the inability of present carriers to provide an adequate supply of equipment during peak building and construction periods as one reason for its support. It contended that there existed an urgent need for responsive, economic motor carriage to be supplied with consistent service over extended periods of time. In addition, Georgia-Pacific expressed a need for a shipper which would be able to provide for its specialized service needs.[9]

Georgia-Pacific predicted that it would tender 10 to 50 truckloads per week to Keim, depending on the carrier's capacity. It named no specific representative destinations or origins of its traffic but stated only "points in the United States." Keim points out in its brief, however, that Georgia-Pacific has at least two facilities in each of the 48 contiguous states.

Keim's application sent its potential competitors scurrying to the Commission for Keim-otherapy.[10] They complained of diversion of shipper traffic,[11] economic depression in the motor carrier industry in general, and other individual adverse economic consequences resulting from the

granting of authority to Keim. In addition, the protestants argued that Keim was not in a position to perform the nationwide service proposed. To alleviate their suffering, the protestants asked that the Commission (i) limit Keim's authority to the shipper's facilities, (ii) deny Keim's certification altogether because it had not met its burden of proof under the Motor Carrier Act or, (iii) if it had met its burden, find that the protestants had overcome Keim's showing by evidence of their own.

Despite the protests, the Commission found that Keim had met its more relaxed burden of proof under the Motor Carrier Act that the service proposed would serve a useful public purpose, responsive to a public demand or need. It determined that the granting of authority to Keim would improve Georgia-Pacific's competitive posture and enable it to expand its market. Moreover, it concluded that a grant would offer the shipper a broader choice of carriers for meeting its transportation needs and help assure the availability of sufficient vehicles when needed. It pointed out that the protestants individually and collectively were unable to provide the shipper with the degree of service proposed by Keim and had not shown that "piecemeal fragmentation of the application to protect their interest is tantamount to the public interest." *Keim Extension, supra* note 11, at 5.

The Commission rejected the protestants' suggestion that a grant of common carrier

**8.** Georgia-Pacific is a Georgia corporation which has its corporate headquarters in Portland, Oregon. It is engaged in the manufacture of lumber, lumber mill products, plywood, doors, roofing, paper, paper board, converted paper products, wood pulp, plastics, chemicals, resins, gypsum products, iron and steel products and other items utilized in the building and construction industry as well as many other operations. In these activities, Georgia-Pacific employs approximately 44,000 people, has 219 manufacturing plants, and maintains 163 wholesale Distribution Centers and 129 Sales Offices throughout the United States and Canada.

**9.** Among those specialized needs listed in the Verified Certification of Shipper or Witness Support submitted by Georgia-Pacific were:
1. Irregular route service.
2. Equipment that is of proper length and type.

3. Time deliveries for job site sales.
4. Utilization of outbound equipment for inbound raw materials, equipment and supplies.
5. Equipment available within the vicinity of plant due to short lead time on orders.

**10.** Keim's application was opposed by Truck Transport, Inc., F–B Truck Line Co., Greenleaf Motor Express, Inc., Steere Tank Lines, Inc., Huston Truck Line, Inc., Schilli Motor Lines, Inc., Erickson Transport Corp., Melton Truck Lines, Inc., and Warren Transport, Inc.

**11.** Protestant Melton for example, estimated that on a yearly basis over 50% of its operating revenues would be subject to diversion by a grant of authority to Keim. *See* Keim Transportation, Inc., Extension-United States, No. MC–2095 (Sub-No. 33F) (February 26, 1981) at 2 [hereinafter cited as Keim Extension].

authority to Keim be restricted to service for its supporting shipper only. It pointed out that the protestants had shown no likely adverse effects from an unrestricted grant and, furthermore, that a single shipper may be considered as representative of a need for service in the community generally. It continued by stressing that limiting service to a certain shipper would be inconsistent with common carrier status and the direction of the MCA against unnecessary restrictions. Thus, the Commission concluded that, on balance, the protestants had failed to show that they would be jeopardized to an extent contrary to the public interest and that the application should be granted as sought.

On this basis, the Commission granted to Keim the following authority:

[T]o operate as a common carrier, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting (1) gypsum or gypsum products, (2) building materials except those in (1) and (4), (3) paper and paper products, (4) chemicals and plastic products, and (5) materials, equipment, and supplies used in the manufacture, installation and distribution of commodities in (1) and (4) above, between points in the United States (except Alaska and Hawaii).

### C. *Energy Carriers' Application*

Energy Carriers requested authority to transport petroleum products, in bulk, in tank vehicles between points in California, Oregon, Washington, Idaho, Montana, Nevada, Utah, Wyoming, Colorado, Arizona, New Mexico, and Texas.

At the time of its application, Energy Carriers had authority to operate as a common carrier, by motor vehicle, in interstate or foreign commerce over irregular routes, transporting blended gasoline, distillate fuel oil, and jet fuels, in bulk, between points in Arizona, Clark County, Nevada, and those points in California in and south of Ventura, Los Angeles, and San Bernadino Counties, California. *See* Energy Carriers, Inc., ICC Certificate MC–146195 (Sub 2F). *See also* Energy Carriers, Inc., Extension-Petro-

leum Products, No. MC–146195 (Sub-No. 3F) (April 14, 1981) [hereinafter cited as Energy Carriers Extension].

Two shippers, Chevron U.S.A. (Chevron) and Union Oil Company of California (Union Oil) supported Energy Carriers' application. Both shippers are major U.S. oil companies engaged in the exploration, production, refining and marketing of petroleum and its products.

Chevron expressed a need for the applicant's services because truck service was not always available when required. According to Chevron, rail service is unreliable from a scheduling standpoint, and marine service is limited to sea ports and not a realistic substitute for truck service. In addition, pipeline service is occasionally interrupted for various reasons. Chevron also cited its special need for a transportation company which could transport bulk grease which it markets.

Chevron estimated that fifty truck loads annually would be tendered to Energy Carriers if the application were granted; however, it pointed out that it estimated a significant increase in shipments in the future. Chevron cited as representative origins of the supporting shipper's traffic the following: Los Angeles and San Francisco Bay areas, California, Portland, Oregon, Seattle, Washington, Salt Lake City, Utah, and El Paso, Texas. Typical destinations were Phoenix, Tucson, and other points in Arizona, points in Nevada, Oregon, Washington, Idaho, Utah and other western states.

Union Oil expressed similar reservations about its current transportation alternatives. It cited the unreliability of rail and pipeline service and the desirability of flexible motor carrier service. Like Chevron, Union Oil markets bulk grease in tank vehicles for which limited service was available and for which, it hoped, the applicant might furnish needed service.

Union Oil estimated that it would tender to Energy Carriers twenty-five truckloads annually. Like Chevron, it predicted significant increases in future years. As repre-

sentative origins of the supporting shipper's traffic it cited current points in and around the Los Angeles and San Francisco, California areas, Portland, Oregon, and Seattle, Washington, but pointed out that because of rapidly changing conditions in the petroleum industry, other points might be included. It listed destinations in "every major point" in the states of California, Oregon, Washington, Idaho, Nevada, Arizona, Wyoming, Montana, Colorado and New Mexico.

Energy Carriers' application, like that of Keim, gave its potential competitors a severe case of truckage apoplexy.[12] Their complaints included a general failure on the part of Energy Carriers to fulfill its burden of proof under the Motor Carrier Act, problems with conflicting authority and diversion of traffic,[13] and a general inability on the part of Energy Carriers to provide the authorized services.

Despite the evidence presented by the protestants, the Commission found that the service proposed would serve a useful public purpose, responsive to a public demand or need and that the applicant was fit, willing, and able properly to perform the authorized service. It found that both Union Oil and Chevron had an expanding need for the proposed motor carrier service. It pointed out that rail and pipeline transportation was becoming increasingly inadequate and that alternative transportation companies were unable to provide sufficient equipment to meet the shippers' peak service demands.

In addition, the Commission saw no adverse impact to the public in granting the requested authority. The Commission observed that only one of the protesting carriers, Calzona, appeared to have participated in the movement of supporting shippers'

traffic to any significant extent. Thus, the Commission determined that the protestants had failed clearly to demonstrate that a grant of authority to Energy Carriers would adversely affect their ability to serve the public to an extent contrary to the public interest. It concluded, therefore, that the benefits to be derived by a grant of authority to Energy Carriers outweighed any real or potential detriment to the protestants and that a grant of the authority requested would be consistent with public convenience and necessity.

On this basis, the Commission granted to Energy Carriers authority to conduct the following operations:

> To operate as a common carrier, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting petroleum products, in bulk, in tank vehicles, between points in California, Oregon, Washington, Idaho, Nevada, Utah, Arizona, Wyoming, Montana, Colorado, New Mexico and Texas.

## II. *An Applicant OK Keeps the Protestants Away, or Does It?*

Steere[14] points to five asserted infirmities in the Commission's grant of transportation authority to Keim and to Energy Carriers. It argues first that the ICC used an incorrect standard of proof of public need in ruling on the Keim and Energy Carriers applications. Second, it contends that, under the appropriate standard, there is insufficient evidence in the record to support the conclusion that each applicant sustained its initial burden of showing that the proposed services "will serve a useful public purpose, responsive to a public demand or need." Third, Steere asserts that neither

12. Energy Carriers' application was opposed by Ward Transport, Inc., Northern Tank Line, Steere Tank Lines, Inc., Ruan Transport Corp., Calzona Transportation, Inc. and Arizona Tank Lines, Inc.

13. Calzona Transportation, for example, suggested that over 20% of its interstate revenue would be diverted by a grant of authority to Energy Carriers. It stated that its total interstate revenue in 1980 was $1,818,681.90. Of this amount, $190,834.43 (10.5%) was derived

from service to Chevron, one of Energy Carriers' supporting shippers, and $177,806.17 (9.8%) was derived from service to Union Oil, the other supporting shipper of Energy Carriers' application.

14. For our purposes here, we will use the name Steere to include both petitioner Steere Tank Lines, Inc. and the intervenor in support of the petitioner, Truck Transport, Inc.

applicant has sustained its burden of proving by substantial evidence that it is presently fit, willing, and able to provide the transportation authorized for the public at large. Fourth, Steere challenges the adequacy of the Commission's findings. As its final confirming symptom, Steere finds error in the Commission's failure to require Energy Carriers to obtain approval under 49 U.S.C. § 11343(a)(4) (common control provisions) prior to certification or to provide evidence that such approval was not necessary. Steere's diagnosis: fatal error requiring nullification of the granted certificates.

### A. *Public Need*

1. The Applicant's Burden of Proof:

Who Shall Decide when Doctors Disagree? [15]

The petitioners here argue that the ICC has used an erroneous lesser standard of proof of public need in granting transportation authority to Keim.[16] As evidence of this misrepresentation, Steere points to the ICC's discussion of the "public need" requirement in the *Keim* decision where the Commission asserts that the more relaxed standard of proof under the MCA "has the effect of shifting the major burden upon opposing parties to establish that the proposed service 'is inconsistent with the public convenience and necessity.' " *Keim Extension, supra* note 11, at 4. The petitioners assert that this discussion indicates the Commission's improper reliance on Art-Pape Transfer, Inc., Extension-Commodities in End-Dump Vehicles, 132 MCC 84, 92–98 (1981), a case which petitioners contend was overruled by Tri-State Motor Transit Co., Extension-General Commodities, 132 MCC 504 (1981). In *Tri-State,* the Commission held that an applicant's evidence "must establish with reasonable particularity a rational connection between the specific public need shown and the breadth of the authority requested." *Id.* at 513; *see also*

Greenfield Transport Co., Extension-General Commodities, 132 MCC 584, 589 (1981).

■ Petitioners agree that the standard of proof of public need borne by applicants has been lessened under the MCA. They acknowledge that the elimination of the second prong of the *Pan American* test requiring applicants to show the inadequacy of existing service has made the applicant's burden easier. They even point to legislative history which seems to support this view. "The great weight of the testimony, however, was that entry into the motor carrier industry should be liberalized along the lines of the Commission's current policy as set forth in *Ex Parte* No. MC–121." *House Report, supra* note 5, at 14. *See also* text accompanying note 6. What petitioners do not countenance, however, is the view that the "major burden" of proving public convenience and necessity has been shifted to the protestants.

The Commission challenges Steere's characterization of the test applied in *Keim*. It asserts that the standard used is consistent with *Tri-State*'s view that "the new legislation has the effect of 'lessening the burden of proof on applicant's and correspondingly increasing the burden on persons opposing the application.' " *Tri-State,* 132 MCC at 513. The Commission points out that it cited *Art-Pape* only to support the proposition that the new Act's criteria lessened the burden upon applicants to establish a *prima facie* case and placed the burden upon those opposing an application to show that the grant of authority is inconsistent with public convenience and necessity.

On balance, we think that the view of the Commission is correct. Moreover, we believe the Commission's statements to be completely consistent with petitioner's argument and with the language of the MCA.

It is undisputed here that the traditional "public convenience and necessity" requirement (*see* Part IA's discussion of the MCA)

---

**15.** A. Pope, Moral Essays, Epistle III, *Lord Bathurst* (1732).

**16.** Petitioner argues that no discernible standard of proof was used in the Energy Carriers

application. Thus, although the analysis here applies equally to the *Energy Carriers* case, our discussion here will focus primarily on Keim's application.

has been revised under the 1980 Act. Under the MCA, an applicant is no longer required to show that existing service is inadequate. *See Assure Competitive Transportation,* 635 F.2d 1301, and text accompanying note 6. The legislative history indicates that this aspect of an applicant's traditional burden of proof has, under the MCA, been shifted to those opposing the application once a *prima facie* case has been made. Indeed, the Committee was quite specific in its reasons for this change when it said:

> Under new section 10922(b)(1), once the applicant has made a *prima facie* showing that the proposed service would serve a useful public purpose, the burden of proof would shift to persons opposing issuance of the certificate to show that the proposed service is inconsistent with the public convenience and necessity. In other words, it creates a presumption that the grant of the application is consistent with the public convenience and necessity if the applicant demonstrates that the proposed service will serve a useful public purpose. The Committee believes that placing the burden of proof squarely on persons opposing issuance of the certificate is clearly required by today's conditions in the motor carrier industry. It is only the opposing carriers who are in a position to show the impact which a grant of authority will have on them, and it is logical to place upon them the responsibility for developing the record and bearing the burden of producing the evidence with regard to these issues.

The statute itself also places the burden of showing inconsistence with public convenience and necessity on the opponents when it provides that the Commission shall issue a certificate to a person making the requisite showing "unless the Commission finds, on the basis of evidence presented by the *persons objecting to the issuance of the certificate,* that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity." 49 U.S.C. § 10922(b)(1) (emphasis added). The legislative history, the case authority relied upon by the Commission, and the statute itself then support the Commission's view as to where the burden of proof *on this one issue* should be placed. We stress, however, that the *applicant* bears the burden of proving that it is "fit, willing, and able" to provide the transportation to be authorized and that the service proposed will serve a useful public purpose, responsive to a public demand or need. Only when this burden is satisfied, does it become incumbent upon the opponents to show that the transportation to be authorized is inconsistent with public convenience and necessity. Thus, some discussion, and, with hope, some clarification of an applicant's *prima facie* burden will be helpful.

■ The parties disagree as to what sort of showing must be made by an applicant to satisfy the public need requirement. The ICC argues that persons supporting the application must come forward with "some evidence" of a public need or demand for the service, pointing to the legislative history of the MCA. *House Report, supra* note 5, at 14. The petitioners, on the other hand, argue that the traditional "substantial evidence" requirement applies here. We agree with the petitioners that in order to make out a *prima facie* case under the Motor Carrier Act, an applicant must submit substantial evidence that its proposed service will serve a useful public purpose, responsive to a public demand or need.

■ The substantial evidence standard is to the anatomy of administrative law what the heart or lungs are to the human constitution. It breathes life into the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (E), which provides that an agency determination must be set aside only if it is "arbitrary, capricious, ... [or] unsupported by substantial evidence." *See Watkins Motor Lines, Inc. v. ICC,* 641 F.2d 1183, 1188 (5th Cir.1981). It is well-recognized in the decisions of the Supreme Court. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 488, 95 L.Ed. 456 (1951); *see* 4 K. Davis, Administrative Law Treatise § 29.-03, 29 (1958); L. Jaffe, Judicial Control of Administrative Action 601 (1965). Recent

cases under the Motor Carrier Act have reaffirmed it.[17]

On the other hand, the purported "some evidence" standard found in the legislative history has not been adopted by the Commission or any court. In fact, the Commission specifically rejected it in *Averitt Express. See* note 17, *supra.* Following the Commission's pronouncement and the decisions of our sister circuits, we decline to adopt a "some evidence" standard for cases arising under the Motor Carrier Act and hold that an applicant is required to show by substantial evidence that its proposed service will serve a useful public purpose, responsive to a public demand or need.

■ The preceding discussion of the various proposed standards of proof of public need should not obscure the fact that our review here is a limited one: whether the ICC's grant of authority was supported by substantial evidence. As the Supreme Court stated:

A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.... Although this inquiry into the facts is to be searching and care-

ful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' ... The agency must articulate a 'rational connection between the facts found and the choice made.' ... While we may not supply a reasoned basis for the agency's action that the agency itself has not given, ... we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.

*Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (citations omitted); *Steere Tank Lines, Inc. v. ICC,* 687 F.2d at 106 ("[I]t is equally true, as we have said in nearly every recent public convenience and necessity case, that 'the Commission's explanation need not be crystalline, as long as it enables the parties to understand the basis of the decision,' *J.H. Rose Truck Line, Inc. v. ICC,* 683 F.2d 952, at 956 (5th Cir. 1982)"); *Trailways, Inc. v. ICC,* 681 F.2d 252, 254 (5th Cir.1982); *Alamo Express, Inc. v. ICC,* 673 F.2d 852, 856 (5th Cir.1982); *Central Freight Lines, Inc. v. United States,* 669 F.2d 1063, 1074 (5th Cir.1982).

**17.** In *Port Norris Express Co. v. ICC,* 697 F.2d 497, 502–03 (3d Cir.1982), the court stated:

The ICC and the United States of America, respondents in this case, assert that an applicant need only demonstrate 'some evidence of a public need or demand for the service'.... In our view, however, an applicant must establish by 'substantial evidence' that it meets the statutory criteria set forth in 49 U.S.C. § 10922(b)(1)(A) and (B). The Administrative Procedure Act, 5 U.S.C. § 551, *et seq.,* the statute which sets forth the applicable standard of review for judicial review of administrative agency decisions provides that: 'Subsequent statute may not be held to supercede or modify this subchapter ... except to the extent that it does so expressly.' 5 U.S.C. § 559. The Motor Carrier Act of 1980 did not expressly supercede or modify the rules set forth in the Administrative Procedure Act. Furthermore, the ICC itself has stated that '[t]he Commission has never applied a "some evidence" rule' and that '[a]pplicants remain responsible for submitted sufficient evidence to carry their statutory *prima facie* case.' Averitt Express Inc.,

Extension-Points in the United States, No. MC–121600 (Sub-No. 13F) (unprinted; Division 1), (February 6, 1981). *See also* Rockingham Carriage Service, Inc., Extension-Trucks, Truck Chassis, Trailers and Buses, No. MC–153553 (Sub-No. 1) (unprinted; Division 1), (January 8, 1982), in which the ICC vacated a nationwide nonradial grant of authority because 'from a territorial standpoint, the Review Board's grant is not supported by the requisite reliable, probative and substantial evidence.' *Id.* at 1.

Again in *Deaton, Inc. v. ICC,* 693 F.2d 128, 130 n. 3 (11th Cir.1982), the court observed that "the ICC argues that the Motor Carrier Act of 1980, which somewhat relaxed the regulatory scheme, requires only 'some evidence' of public need.... While acknowledging that Congress intended the amendments to ease carrier entry, ... we emphasize that our requirement of a 'representative showing of public need' has survived the statutory change." (citations omitted). *See Baggett Transportation Co. v. United States,* 666 F.2d 524 (11th Cir. 1982); *Refrigerated Transportation Co. v. ICC,* 663 F.2d 528, 530–31 (5th Cir.1981).

## 2. Evidence of Public Need

### a. Keim

Steere argues that there is not substantial evidence in the record here to support the conclusion that Keim sustained its burden of demonstrating that its proposed service would serve "a useful public purpose, responsive to a public demand or need." As grounds for this argument, Steere points out that Keim's supporting witness did not state the actual commodities over which he had authority to tender traffic or which his division had to ship, the origin or destination points for such shipments, the carriers used, or the specific service deficiencies of any specific carrier. Steere also argues that Keim's supporting shipper gave no reason why Keim's service in particular would benefit it. We see little merit to Steere's arguments.

■ Steere argues first that Keim's witness, Sidney MacKenzie, the Assistant Gypsum Transportation Manager, Gypsum Division, Georgia-Pacific, failed to state the specific commodities over which *he* had authority to tender traffic and which *his* division had to ship. Steere contends that we must look only to those commodities to support Keim's application because MacKenzie could only have spoken for his own division. We cannot agree. MacKenzie here represented Georgia-Pacific as a whole and the fact of his employment by a particular division is not controlling. Nothing in the MCA requires the president, vice president or other high officer to speak on behalf of the supporting shipper or that each division head speak only on behalf of his or her particular division. We refuse to impose such a requirement here.

■ In its Verified Certification, Georgia-Pacific listed specific commodities which would be transported under the operating authority sought.[18] Though Steere would disagree, we attach no significance to the fact that these listed commodities precisely correspond to those for which Keim

was granted authority. In fact, we would be disturbed only if they did not. In addition, Georgia-Pacific stated that it would tender to the applicant approximately 10 to 50 truckloads per week, depending upon Keim's ability to provide the necessary equipment. In *Steere*, [No. 81–4497] 687 F.2d at 107, we held that the testimony of supporting shippers that they "would use" the new service, even in the absence of an indication of the exact number of shipments per month or week that they expected to tender if the new service were approved, was "more than enough to satisfy the 'substantial evidence' test." Thus, we hold that, with regard to the specific commodities to be transported, the ICC's decision was supported by substantial evidence.

■ Steere argues second that the ICC's decision in *Keim* is not supported by substantial evidence because the supporting shipper here failed to give representative origin and destination points for the proposed shipments. In its Verified Certification, Georgia-Pacific had stated as representative origins and destinations simply "points in the United States."

This court recently discussed the showing by a supporting shipper required to uphold a grant of nationwide authority. In *C & H Transportation Co. v. ICC*, 704 F.2d 834 (5th Cir.1983), the court held that the shippers' statements provided substantial evidence of the nationwide character of their shipping needs sufficient to support the ICC's decision granting nationwide authority even though "some of the evidence respecting the geographic scope of the need shown is very weak and unsatisfactory standing alone.... [T]he showing made overall coupled with the business practices used by the majority of the shippers, constitutes substantial evidence at least minimally sufficient to uphold the grant of nationwide authority." *Id.* at 845.

In addition to Georgia-Pacific's statement in its Verified Certification, the record here contains references to Georgia-Pacific's fa-

---

**18.** (1) Gypsum, gypsum products, building materials, paper and paper products, chemicals and plastic products and (2) materials, equip-

ment and supplies used in the manufacture, installation, distribution and sale of commodities in (1) above.

cilities in Kansas, Missouri and Texas, *see Affidavit of Glen Keim* at 4, and grants of authority to Keim to transport goods from those facilities to points in Arizona, California, Montana and other western states, as well as to Illinois, Indiana and Kentucky. Moreover, Keim and the Commission urge that given the far-flung operations of Georgia-Pacific, with at least two facilities in each of the 48 contiguous states, the Commission was justified in inferring that there would be sufficient origins and destinations to sustain the granted authority. We agree.

Though we stress that the evidence here is, as in *C & H Transportation,* quite weak, we conclude that the references in the record to points served combined with the extensive nationwide operations conducted by Georgia-Pacific provide evidence at least minimally sufficient to uphold the grant of nationwide authority to Keim. Nothing would be served here by remanding the matter to the Commission for the sole purpose of Georgia-Pacific's listing origins and destinations which we are satisfied exist in sufficient quantities to support the granted authority. The patient need not step on the scale for the doctor to know he is overweight.

Steere argues third that the supporting shipper failed to list specific service deficiencies of any specific carrier and, gave no reason why Keim's service would benefit Georgia-Pacific. Such an argument appears to urge the resuscitation of the *Novak* requirement that an applicant show the inadequacy of existing service. Steere admits, in its Reply Brief at 15, however, that the argument is merely another way of alleging that the evidence submitted by Keim in support of its application is not representative of the needs of the shipping public. Thus, we turn to that argument now.

■ Steere argues that Georgia-Pacific's traffic was not shown to be representative of the needs of the shipping public in the continental United States. On that basis, it insists that a "facilities" grant was the maximum supportable authority. We begin by observing that a grant of authority based on the evidence supplied by a single shipper has been held to be sufficient to support a nationwide grant of authority on two occasions. *Kenosha Auto Transport Corp. v. United States,* 684 F.2d 1020 (D.C. Cir.1982); *Refrigerated Transport Co., Inc. v. ICC,* 673 F.2d 1196, 1199–1200 (11th Cir. 1982). Moreover, this same argument was recently rejected in a similar context in *C & H Transportation,* 704 F.2d at 844, where the court held that "the need for nationwide authority was expressed by Kansas City area shippers, and we see no reason why the Commission could not grant Ricky Shaw nationwide authority to satisfy their need whether or not a similar need was felt by shippers of similar goods in the rest of the nation." On this basis, we conclude that a corporation like Georgia-Pacific, with extensive operations across the country, is sufficiently representative to satisfy the requirements of the MCA.

Having determined that Georgia-Pacific's needs are representative of the shipping public sufficient to support a grant of nationwide authority, we need not reach Steere's argument that a "facilities" grant was the maximum supportable authority. We would point out, however, that the Commission has recently held that a facilities restriction is unacceptable in a grant of new authority, expressly overruling previous decisions which permitted such limitations. *Eckert Trucking, Inc., Extension-Building Materials,* 132 MCC 829, 830 (July 2, 1982).

### b. Energy Carriers

■ Steere urges that Energy Carriers has not sustained its statutory burden of proof of public need in that it has presented no evidence of petroleum products shipments in Texas or New Mexico, Steere's primary market. The record indicates, however, that one of Energy Carriers' shippers, Union Oil, listed as representative destination areas several western states including New Mexico. Chevron, Energy Carriers' other supporting shipper, also listed as typical origin points for its traffic cities in Texas. In addition, both shippers referred

to "other western states" in their statements of need for the proposed services. Both also anticipated future traffic movements into those areas. In *American Trucking Associations,* 659 F.2d at 474, this Court held, "Just as in the past, it [the Commission] may consider other evidence, such as traffic studies or anticipated future movements, 45 Fed.Reg. 86,799–86,800 (1980)," in making a grant of authority under the MCA. On this basis, we hold that there is adequate evidence of shipments by Chevron and Union Oil to meet the requirements of the MCA.

▪ Steere argues second that the evidence supplied by Energy Carriers in support of its application was not representative of the Texas and New Mexico markets because its supporting shippers had no traffic in that market. As suggested, the supporting shippers' combined evidence demonstrates that the "present direction" of their traffic includes points in Texas and New Mexico. Moreover, it is not necessary for the applicant to demonstrate a need for service at each point it wishes to serve. All that is required is that it present sufficient representative evidence so that the ICC can make an informed determination of the public interest. *Kenosha,* 684 F.2d at 1030. As the court pointed out, "There is no requirement that data on public need and benefit be gathered for every village and hamlet in the area proposed operations before certificate of such encompassing scope may be awarded." *Id.; May Trucking Co. v. United States,* 593 F.2d 1349, 1353 (D.C. Cir.1979). This court, in its exhaustive and scholarly opinion in *American Trucking Association,* 659 F.2d at 475, reflected this view when it held that a grant of statewide authority does not need support from all, or even most of the municipalities of the state. *See,* e.g., *Miller Transporters, Inc. v. United*

*States,* 594 F.2d 463 (5th Cir.1979). Finally, in *C & H Transportation,* 704 F.2d at 845, we determined that certain types of traffic do not lend themselves to precise identification of points to be served. One of Energy Carriers' shippers, Union Oil, pointed out that stated origins could be any point due to the "changing situations in the petroleum industry." *Energy,* Document 1. This factor, combined with the specific origin and destination listings of Energy Carriers' supporting shippers, provides sufficient basis for the ICC's grant of authority to Energy Carriers. On that basis, we hold that the evidence supplied by Chevron and Union Oil constituted representative evidence sufficient to uphold the grant of authority to Energy Carriers.

Having reached this decision, there is no need for further discussion of Steere's argument that the limitation of a grant to the facilities of the supporting shippers is the only supportable, rational alternative to the denial of the common carrier application involved.[19]

### B. *Fitness: Are Keim and Energy Carriers Terminally Ill?*

#### 1. The ICC's Findings: Commission Heal Thyself

▪ Steere argues initially that the Commission's decisions in the *Keim* and *Energy Carriers* cases contain no basic findings on either applicants' fitness, willingness and ability. Steere argues that the ICC's decision therefore violates both the MCA, 49 U.S.C. § 10922(b)(1)(A), *supra* note 7, and the Administrative Procedure Act, 5 U.S.C. § 557(c), which provides:

All decisions, including initial, recommended and tentative decisions, are part of the record and shall include a statement of (a) findings and conclusions and the reasons or basis therefor, on all the

---

**19.** The Commission points out that to grant Energy Carriers authority to serve only the plant sites of its supporting shippers would have been particularly inappropriate given the involved commodities—petroleum products. The Commission states that it considers the transportation of petroleum critical to the public welfare and authorizes carriers of this com-

modity to serve all points in a given area, not just one point or an isolated number of points. *See* David W. Hassler, Inc., Extension-Petroleum Products, 128 MCC 864, 870; Merrill Transport Co., Extension-Petroleum, 120 MCC 543, 548 (1974); *Cf. Appleyard's Motor Transportation Co. v. ICC,* 592 F.2d 8 (1st Cir.1979).

material issues of fact, law or discretion presented by the record;

Moreover, petitioners insist that 49 U.S.C. § 10322(b)(1) requires more than is to be found in the Commission decision. That section provides:

If evidence is submitted in writing or testimony is taken at an oral hearing, the initial decision shall include specific findings of fact, specific and separate conclusions of law, an order, and justification for the findings of fact, conclusions of law, and order.

Thus, petitioners urge that Keim's and Energy Carriers' certificates should be vacated and the matter remanded to the Commission for appropriate findings and conclusions. We agree.

On the basis of our own search of the record, we might agree that the Commission's grant of certificates to Keim and to Energy Carriers was permissible [should have been granted]; nevertheless, we may not supply "a reasoned basis for the agency's action that the agency itself has not given ..." *Bowman Transportation*, 419 U.S. at 285–86, 95 S.Ct. at 442. Here, the Commission *itself* has not demonstrated through any basic findings on fitness that it relied on such evidence in making its conclusion.

▮ Though its findings need not be detailed, nor "crystalline", *Dean Truck Line v. ICC*, 688 F.2d 254, 256 (5th Cir.1982), and the ICC need not annotate each finding with the evidence to support it, *United States v. Pierce Auto Freight Lines, Inc.*, 327 U.S. 515, 536, 66 S.Ct. 687, 698, 90 L.Ed. 821 (1946), the Commission is required to make adequate findings under both the APA and the MCA. The requirement for specific, definite, and basic findings, not mere ultimate findings or conclusions is well settled and without contradiction. *See United States v. Pierce Auto Freight Lines*, 327 U.S. 515, 66 S.Ct. 687, 90 L.Ed. 821 (1946); *Colorado-Wyoming Co. v. Federal Power Commission*, 324 U.S. 626, 65 S.Ct. 850, 89 L.Ed. 1235 (1945); *Morgan v. United States*, 298 U.S. 468, 56 S.Ct. 906, 80 L.Ed. 1288 (1936); *United States v. Chicago, Mil-*

*waukee, St. Paul & Pacific Railroad Co.*, 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023 (1935); *Florida v. United States*, 282 U.S. 194, 51 S.Ct. 119, 75 L.Ed. 291 (1931); *Sealed Air Corp. v. United States International Trade Commission*, 645 F.2d 976, 998 (C.C.P.A. 1981); K. Davis, Administrative Law Treatise, Chap. 16, ¶ 16.01–.14. Moreover, the absence of required findings is fatal even though there may be ample evidence to make the finding. As stated in *Anglo-Canadian Shipping Co. v. Federal Maritime Commission*, 310 F.2d 606, 617 (9th Cir. 1962);

For the Commission, without any attempt whatever to comply with the requirements of § 8(b) [now 5 U.S.C. 557(c)] to issue its conclusory order of January 23, 1962, merely in the language of the statute, was an egregious error. As noted in [*Saginaw Broadcasting Co. v. FCC*, 96 F.2d 554, 563 (D.C.Cir.1938)], the absence of required findings is fatal to the validity of an administrative decision regardless of whether there may be in the record evidence to support proper findings. We were not required therefore to inquire as to what evidence there was which might have supported adequate findings ....

Since there are no factual findings whatsoever on fitness in the orders below, the orders are not in compliance with 5 U.S.C. § 557(c) and 49 U.S.C. § 10322(b)(1).

We acknowledge that we and several other courts have allowed grants of authority to stand in the presence of minimal or cryptic findings by the Commission. *See C & H Transportation*, 704 F.2d at 847; *Star Delivery & Transfer v. United States*, 659 F.2d 81 (7th Cir.1981); *see also Alamo Express*, 673 F.2d at 860. Were there *any* discussion other than the ultimate findings here, we would be tempted to do the same. However, in this matter, the ICC has completely abdicated its responsibilities for fact-finding under the APA and MCA to the courts. This, we cannot countenance. As such, we vacate the Commission's grant of authority in this regard and remand the *Keim* and *Energy Carriers* matters to the ICC for the

purpose of making "specific findings on fact, specific and separate conclusions of law . . . and justifications for the findings of fact [and] conclusions of law," on the issue of fitness only.

### 2. Evidence of Fitness

In light of our decision to remand the *Keim* and *Energy Carriers* matters for basic findings on fitness, we do not reach the issue of whether the Commission's determination that Keim and Energy Carriers were fit, willing and able to perform the authorized service was supported by substantial evidence in the record. To do otherwise would be akin to diagnosing anemia without benefit of a blood test. Thus, this question is reserved until the Commission has completed its evidentiary biopsy.

### C. A Cure for the Common Control

Steere argues finally that the *Energy Carriers* decision is in error on the issue of common control. Under 49 U.S.C. § 11343(a)(4), the acquisition of control of at least two carriers by a person who is not a carrier may be carried out only with the approval and authorization of the Commission.

The record indicates that Energy Carriers is owned by Landy Corporation (Landy), a non-carrier, which owns another common carrier, Allyn Transportation. As petitioner points out, approval by the Commission of this acquisition has not yet been obtained by Landy and notice of the applicant's control by Landy was not published in the Federal Register. Thus, Landy must either obtain the Commission's approval of its common control of the two motor carriers or submit evidence to the Commission suggesting why such approval is unnecessary. Neither was done in this case. Thus, there is here an apparent violation of 49 U.S.C. § 11343.

 Such a violation, however, has no application or relevance to the issue of whether Energy Carriers has demonstrated

that its proposed operations satisfy the requirements of the MCA. We can find no case in the substantial body of law accompanying 49 U.S.C. § 11343 [formerly 49 U.S.C. § 5(2)(a)], in which any court has held that a *certificate* of authority should be denied or revoked because of a failure to apply for approval under 49 U.S.C. § 11343(a)(4). It is doubtful that Congress, in its effort to streamline and simplify agency proceedings under the MCA, intended for certain unrelated statutory violations to upset entire proceedings concerning grants of authority. We think Congress did not so intend, and we do not so hold.[20]

### III. Prescription

1. For findings deficiency, *see* Part II(B)(1) *supra*, remand *Keim* and *Energy Carriers,* Nos. 81–4293 and 81–4326, respectively, to the Commission (one ICC) for basic findings on fitness;

2. *Recommended:* that Energy Carriers file application on common control or submit evidence why such application is not necessary;

3. In all other respects, the decision of the ICC is affirmed.

As for future panels faced with this plague on their courthouses, we have no remedy. To them, we offer only the medical profession's universal palliative: take two aspirins and call us in the morning.

**AFFIRMED IN PART, REMANDED IN PART.**

---

**20.** In the event that no application is filed within a reasonable time after the issuance of this opinion, or that, on considering such application, the Commission does not give its approval [an unlikely occurrence given the small size of the companies involved], our opinion should not be construed as preventing the Commission from taking whatever action is appropriate with regard to Energy Carriers' certificate.